# ELDRED ET AL. *v.* ASHCROFT, ATTORNEY GENERAL

No. 01–618.   Argued October 9, 2002—Decided January 15, 2003

188

GINSBURG, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. STEVENS, J., *post*, p. 222, and BREYER, J., *post*, p. 242, filed dissenting opinions.

*Lawrence Lessig* argued the cause for petitioners. With him on the briefs were *Kathleen M. Sullivan, Alan B. Morrison, Edward Lee, Charles Fried, Geoffrey S. Stewart, Donald B. Ayer, Robert P. Ducatman, Daniel H. Bromberg, Charles R. Nesson,* and *Jonathan L. Zittrain.*

*Solicitor General Olson* argued the cause for respondent. With him on the brief were *Assistant Attorney General McCallum, Deputy Solicitor General Wallace, Jeffrey A. Lamken, William Kanter,* and *John S. Koppel.**

---

*Briefs of *amici curiae* urging reversal were filed for the American Association of Law Libraries et al. by *Arnold P. Lutzker* and *Carl H. Settlemyer III;* for the College Art Association et al. by *Jeffrey P. Cunard* and *Bruce P. Keller;* for the Eagle Forum Education & Legal Defense Fund et al. by *Karen Tripp* and *Phyllis Schlafly;* for the Free Software Foundation by *Eben Moglen;* for Intellectual Property Law Professors by *Jonathan Weinberg;* for the Internet Archive et al. by *Deirdre K. Mulli-*

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the authority the Constitution assigns to Congress to prescribe the duration of copyrights. The Copyright and Patent Clause of the Constitution, Art. I, § 8, cl. 8, provides as to copyrights: "Congress shall have

gan, *Mark A. Lemley,* and *Steven M. Harris;* and for Jack M. Balkin et al. by *Burt Neuborne.*

Briefs of *amici curiae* urging affirmance were filed for the American Intellectual Property Law Association by *Baila H. Celedonia, Mark E. Haddad,* and *Roger W. Parkhurst;* for the American Society of Composers, Authors and Publishers et al. by *Carey R. Ramos, Peter L. Felcher, Drew S. Days III, Beth S. Brinkmann,* and *Paul Goldstein;* for Amsong, Inc., by *Dorothy M. Weber;* for AOL Time Warner, Inc., by *Kenneth W. Starr, Richard A. Cordray, Daryl Joseffer, Paul T. Cappuccio, Edward J. Weiss,* and *Shira Perlmutter;* for the Association of American Publishers et al. by *Charles S. Sims* and *Jon A. Baumgarten;* for the Bureau of National Affairs, Inc., et al. by *Paul Bender* and *Michael R. Klipper;* for the Directors Guild of America et al. by *George H. Cohen, Leon Dayan,* and *Laurence Gold;* for Dr. Seuss Enterprises, L. P., et al. by *Karl ZoBell, Nancy O. Dix, Cathy Ann Bencivengo, Randall E. Kay,* and *Herbert B. Cheyette;* for the Intellectual Property Owners Association by *Charles D. Ossola* and *Ronald E. Myrick;* for the International Coalition for Copyright Protection by *Eric Lieberman;* for the Motion Picture Association of America, Inc., by *Seth P. Waxman, Randolph D. Moss, Edward C. DuMont, Neil M. Richards,* and *Simon Barsky;* for the Recording Artists Coalition by *Thomas G. Corcoran, Jr.;* for the Recording Industry Association of America by *Donald B. Verrilli, Jr., Thomas J. Perrelli, William M. Hohengarten, Matthew J. Oppenheim,* and *Stanley Pierre-Louis;* for the Songwriters Guild of America by *Floyd Abrams* and *Joel Kurtzberg;* for Jack Beeson et al. by *I. Fred Koenigsberg* and *Gaela K. Gehring Flores;* for Senator Orrin G. Hatch by *Thomas R. Lee;* for *Edward Samuels, pro se;* and for Representative F. James Sensenbrenner, Jr., et al. by *Arthur B. Culvahouse, Jr.,* and *Robert M. Schwartz.*

Briefs of *amici curiae* were filed for Hal Roach Studios et al. by *H. Jefferson Powell* and *David Lange;* for Intel Corp. by *James M. Burger;* for the Nashville Songwriters Association International by *Stephen K. Rush;* for the New York Intellectual Property Law Association by *Bruce M. Wexler* and *Peter Saxon;* for the National Writers Union et al. by *Peter Jaszi;* for the Progressive Intellectual Property Law Association et al. by *Michael H. Davis;* for George A. Akerlof et al. by *Roy T. Englert, Jr.;* for Tyler T. Ochoa et al. by *Mr. Ochoa;* and for *Malla Pollack, pro se.*

Power . . . [t]o promote the Progress of Science . . . by securing [to Authors] for limited Times . . . the exclusive Right to their . . . Writings." In 1998, in the measure here under inspection, Congress enlarged the duration of copyrights by 20 years. Copyright Term Extension Act (CTEA), Pub. L. 105–298, §§ 102(b) and (d), 112 Stat. 2827–2828 (amending 17 U. S. C. §§ 302, 304). As in the case of prior extensions, principally in 1831, 1909, and 1976, Congress provided for application of the enlarged terms to existing and future copyrights alike.

Petitioners are individuals and businesses whose products or services build on copyrighted works that have gone into the public domain. They seek a determination that the CTEA fails constitutional review under both the Copyright Clause's "limited Times" prescription and the First Amendment's free speech guarantee. Under the 1976 Copyright Act, copyright protection generally lasted from the work's creation until 50 years after the author's death. Pub. L. 94–553, § 302(a), 90 Stat. 2572 (1976 Act). Under the CTEA, most copyrights now run from creation until 70 years after the author's death. 17 U. S. C. § 302(a). Petitioners do not challenge the "life-plus-70-years" timespan itself. "Whether 50 years is enough, or 70 years too much," they acknowledge, "is not a judgment meet for this Court." Brief for Petitioners 14.[1] Congress went awry, petitioners maintain, not with respect to newly created works, but in enlarging the term for published works with existing copyrights. The "limited Tim[e]" in effect when a copyright is secured, petitioners urge, becomes the constitutional boundary, a clear line beyond the power of Congress to extend. See ibid. As to the First Amendment, petitioners contend that the CTEA is a content-neutral regulation of speech that fails inspection

---

[1] JUSTICE BREYER's dissent is not similarly restrained. He makes no effort meaningfully to distinguish existing copyrights from future grants. See, e. g., post, at 242–243, 254–260, 264–266. Under his reasoning, the CTEA's 20-year extension is globally unconstitutional.

under the heightened judicial scrutiny appropriate for such regulations.

In accord with the District Court and the Court of Appeals, we reject petitioners' challenges to the CTEA. In that 1998 legislation, as in all previous copyright term extensions, Congress placed existing and future copyrights in parity. In prescribing that alignment, we hold, Congress acted within its authority and did not transgress constitutional limitations.

I

A

We evaluate petitioners' challenge to the constitutionality of the CTEA against the backdrop of Congress' previous exercises of its authority under the Copyright Clause. The Nation's first copyright statute, enacted in 1790, provided a federal copyright term of 14 years from the date of publication, renewable for an additional 14 years if the author survived the first term. Act of May 31, 1790, ch. 15, § 1, 1 Stat. 124 (1790 Act). The 1790 Act's renewable 14-year term applied to existing works (*i. e.*, works already published and works created but not yet published) and future works alike. *Ibid.* Congress expanded the federal copyright term to 42 years in 1831 (28 years from publication, renewable for an additional 14 years), and to 56 years in 1909 (28 years from publication, renewable for an additional 28 years). Act of Feb. 3, 1831, ch. 16, §§ 1, 16, 4 Stat. 436, 439 (1831 Act); Act of Mar. 4, 1909, ch. 320, §§ 23–24, 35 Stat. 1080–1081 (1909 Act). Both times, Congress applied the new copyright term to existing and future works, 1831 Act §§ 1, 16; 1909 Act §§ 23–24; to qualify for the 1831 extension, an existing work had to be in its initial copyright term at the time the Act became effective, 1831 Act §§ 1, 16.

In 1976, Congress altered the method for computing federal copyright terms. 1976 Act §§ 302–304. For works cre-

ated by identified natural persons, the 1976 Act provided that federal copyright protection would run from the work's creation, not—as in the 1790, 1831, and 1909 Acts—its publication; protection would last until 50 years after the author's death. §302(a). In these respects, the 1976 Act aligned United States copyright terms with the then-dominant international standard adopted under the Berne Convention for the Protection of Literary and Artistic Works. See H. R. Rep. No. 94–1476, p. 135 (1976). For anonymous works, pseudonymous works, and works made for hire, the 1976 Act provided a term of 75 years from publication or 100 years from creation, whichever expired first. §302(c).

These new copyright terms, the 1976 Act instructed, governed all works not published by its effective date of January 1, 1978, regardless of when the works were created. §§302–303. For published works with existing copyrights as of that date, the 1976 Act granted a copyright term of 75 years from the date of publication, §§304(a) and (b), a 19-year increase over the 56-year term applicable under the 1909 Act.

The measure at issue here, the CTEA, installed the fourth major duration extension of federal copyrights.[2] Retaining the general structure of the 1976 Act, the CTEA enlarges the terms of all existing and future copyrights by 20 years. For works created by identified natural persons, the term now lasts from creation until 70 years after the author's

---

[2] Asserting that the last several decades have seen a proliferation of copyright legislation in departure from Congress' traditional pace of legislative amendment in this area, petitioners cite nine statutes passed between 1962 and 1974, each of which incrementally extended existing copyrights for brief periods. See Pub. L. 87–668, 76 Stat. 555; Pub. L. 89–142, 79 Stat. 581; Pub. L. 90–141, 81 Stat. 464; Pub. L. 90–416, 82 Stat. 397; Pub. L. 91–147, 83 Stat. 360; Pub. L. 91–555, 84 Stat. 1441; Pub. L. 92–170, 85 Stat. 490; Pub. L. 92–566, 86 Stat. 1181; Pub. L. 93–573, Title I, 88 Stat. 1873. As respondent (Attorney General Ashcroft) points out, however, these statutes were all temporary placeholders subsumed into the systemic changes effected by the 1976 Act. Brief for Respondent 9.

death.   17 U. S. C. §302(a).   This standard harmonizes the baseline United States copyright term with the term adopted by the European Union in 1993.   See Council Directive 93/98/EEC of 29 October 1993 Harmonizing the Term of Protection of Copyright and Certain Related Rights, 1993 Official J. Eur. Coms. (L 290), p. 9 (EU Council Directive 93/98).   For anonymous works, pseudonymous works, and works made for hire, the term is 95 years from publication or 120 years from creation, whichever expires first.   17 U. S. C. §302(c).

Paralleling the 1976 Act, the CTEA applies these new terms to all works not published by January 1, 1978. §§302(a), 303(a).   For works published before 1978 with existing copyrights as of the CTEA's effective date, the CTEA extends the term to 95 years from publication.   §§304(a) and (b).   Thus, in common with the 1831, 1909, and 1976 Acts, the CTEA's new terms apply to both future and existing copyrights.[3]

### B

Petitioners' suit challenges the CTEA's constitutionality under both the Copyright Clause and the First Amendment. On cross-motions for judgment on the pleadings, the District Court entered judgment for the Attorney General (respondent here).   74 F. Supp. 2d 1 (DC 1999).   The court held that the CTEA does not violate the "limited Times" restriction of the Copyright Clause because the CTEA's terms, though

---

[3] Petitioners argue that the 1790 Act must be distinguished from the later Acts on the ground that it covered existing *works* but did not extend existing *copyrights*.   Reply Brief 3–7.   The parties disagree on the question whether the 1790 Act's copyright term should be regarded in part as compensation for the loss of any then existing state- or common-law copyright protections.   See Brief for Petitioners 28–30; Brief for Respondent 17, n. 9; Reply Brief 3–7.   Without resolving that dispute, we underscore that the First Congress clearly did confer copyright protection on works that had already been created.

longer than the 1976 Act's terms, are still limited, not perpetual, and therefore fit within Congress' discretion. *Id.*, at 3. The court also held that "there are no First Amendment rights to use the copyrighted works of others." *Ibid.*

The Court of Appeals for the District of Columbia Circuit affirmed. 239 F. 3d 372 (2001). In that court's unanimous view, *Harper & Row, Publishers, Inc.* v. *Nation Enterprises*, 471 U. S. 539 (1985), foreclosed petitioners' First Amendment challenge to the CTEA. 239 F. 3d, at 375. Copyright, the court reasoned, does not impermissibly restrict free speech, for it grants the author an exclusive right only to the specific form of expression; it does not shield any idea or fact contained in the copyrighted work, and it allows for "fair use" even of the expression itself. *Id.*, at 375–376.

A majority of the Court of Appeals also upheld the CTEA against petitioners' contention that the measure exceeds Congress' power under the Copyright Clause. Specifically, the court rejected petitioners' plea for interpretation of the "limited Times" prescription not discretely but with a view to the "preambular statement of purpose" contained in the Copyright Clause: "To promote the Progress of Science." *Id.*, at 377–378. Circuit precedent, *Schnapper* v. *Foley*, 667 F. 2d 102 (CADC 1981), the court determined, precluded that plea. In this regard, the court took into account petitioners' acknowledgment that the preamble itself places no substantive limit on Congress' legislative power. 239 F. 3d, at 378.

The appeals court found nothing in the constitutional text or its history to suggest that "a term of years for a copyright is not a 'limited Time' if it may later be extended for another 'limited Time.'" *Id.*, at 379. The court recounted that "the First Congress made the Copyright Act of 1790 applicable to subsisting copyrights arising under the copyright laws of the several states." *Ibid.* That construction of Congress' authority under the Copyright Clause "by [those] contemporary with [the Constitution's] formation," the court said, mer-

ited "very great" and in this case "almost conclusive" weight. *Ibid.* (quoting *Burrow-Giles Lithographic Co.* v. *Sarony*, 111 U. S. 53, 57 (1884)). As early as *McClurg* v. *Kingsland*, 1 How. 202 (1843), the Court of Appeals added, this Court had made it "plain" that the same Clause permits Congress to "amplify the terms of an existing patent." 239 F. 3d, at 380. The appeals court recognized that this Court has been similarly deferential to the judgment of Congress in the realm of copyright. *Ibid.* (citing *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S. 417 (1984); *Stewart* v. *Abend*, 495 U. S. 207 (1990)).

Concerning petitioners' assertion that Congress might evade the limitation on its authority by stringing together "an unlimited number of 'limited Times,'" the Court of Appeals stated that such legislative misbehavior "clearly is not the situation before us." 239 F. 3d, at 379. Rather, the court noted, the CTEA "matches" the baseline term for "United States copyrights [with] the terms of copyrights granted by the European Union." *Ibid.* "[I]n an era of multinational publishers and instantaneous electronic transmission," the court said, "harmonization in this regard has obvious practical benefits" and is "a 'necessary and proper' measure to meet contemporary circumstances rather than a step on the way to making copyrights perpetual." *Ibid.*

Judge Sentelle dissented in part. He concluded that Congress lacks power under the Copyright Clause to expand the copyright terms of existing works. *Id.*, at 380–384. The Court of Appeals subsequently denied rehearing and rehearing en banc. 255 F. 3d 849 (2001).

We granted certiorari to address two questions: whether the CTEA's extension of existing copyrights exceeds Congress' power under the Copyright Clause; and whether the CTEA's extension of existing and future copyrights violates the First Amendment. 534 U. S. 1126 and 1160 (2002). We now answer those two questions in the negative and affirm.

## II

## A

We address first the determination of the courts below that Congress has authority under the Copyright Clause to extend the terms of existing copyrights. Text, history, and precedent, we conclude, confirm that the Copyright Clause empowers Congress to prescribe "limited Times" for copyright protection and to secure the same level and duration of protection for all copyright holders, present and future.

The CTEA's baseline term of life plus 70 years, petitioners concede, qualifies as a "limited Tim[e]" as applied to future copyrights.[4] Petitioners contend, however, that existing copyrights extended to endure for that same term are not "limited." Petitioners' argument essentially reads into the text of the Copyright Clause the command that a time prescription, once set, becomes forever "fixed" or "inalterable." The word "limited," however, does not convey a meaning so constricted. At the time of the Framing, that word meant what it means today: "confine[d] within certain bounds," "restrain[ed]," or "circumscribe[d]." S. Johnson, A Dictionary of the English Language (7th ed. 1785); see T. Sheridan, A Complete Dictionary of the English Language (6th ed. 1796) ("confine[d] within certain bounds"); Webster's Third New International Dictionary 1312 (1976) ("confined within limits"; "restricted in extent, number, or duration"). Thus understood, a timespan appropriately "limited" as applied to future copyrights does not automatically cease to be "limited" when applied to existing copyrights. And as we observe, *infra*, at 209–210, there is no cause to suspect that a

---

[4] We note again that JUSTICE BREYER makes no such concession. See *supra*, at 193, n. 1. He does not train his fire, as petitioners do, on Congress' choice to place existing and future copyrights in parity. Moving beyond the bounds of the parties' presentations, and with abundant policy arguments but precious little support from precedent, he would condemn Congress' entire product as irrational.

purpose to evade the "limited Times" prescription prompted Congress to adopt the CTEA.

To comprehend the scope of Congress' power under the Copyright Clause, "a page of history is worth a volume of logic." *New York Trust Co.* v. *Eisner*, 256 U. S. 345, 349 (1921) (Holmes, J.). History reveals an unbroken congressional practice of granting to authors of works with existing copyrights the benefit of term extensions so that all under copyright protection will be governed evenhandedly under the same regime. As earlier recounted, see *supra*, at 194, the First Congress accorded the protections of the Nation's first federal copyright statute to existing and future works alike. 1790 Act § 1.[5] Since then, Congress has regularly applied

---

[5] This approach comported with English practice at the time. The Statute of Anne, 1710, 8 Ann. c. 19, provided copyright protection to books not yet composed or published, books already composed but not yet published, and books already composed and published. See *ibid.* ("[T]he author of any book or books already composed, and not printed and published, or that shall hereafter be composed, and his assignee or assigns, shall have the sole liberty of printing and reprinting such book and books for the term of fourteen years, to commence from the day of the first publishing the same, and no longer."); *ibid.* ("[T]he author of any book or books already printed . . . or the bookseller or booksellers, printer or printers, or other person or persons, who hath or have purchased or acquired the copy or copies of any book or books, in order to print or reprint the same, shall have the sole right and liberty of printing such book and books for the term of one and twenty years, to commence from the said tenth day of April, and no longer.").

JUSTICE STEVENS stresses the rejection of a proposed amendment to the Statute of Anne that would have extended the term of existing copyrights, and reports that opponents of the extension feared it would perpetuate the monopoly position enjoyed by English booksellers. *Post*, at 232–233, and n. 9. But the English Parliament confronted a situation that never existed in the United States. Through the late 17th century, a government-sanctioned printing monopoly was held by the Stationers' Company, "the ancient London guild of printers and booksellers." M. Rose, Authors and Owners: The Invention of Copyright 4 (1993); see L. Patterson, Copyright in Historical Perspective ch. 3 (1968). Although

duration extensions to both existing and future copyrights. 1831 Act §§ 1, 16; 1909 Act §§ 23–24; 1976 Act §§ 302–303; 17 U. S. C. §§ 302–304.[6]

Because the Clause empowering Congress to confer copyrights also authorizes patents, congressional practice with respect to patents informs our inquiry. We count it significant that early Congresses extended the duration of numerous individual patents as well as copyrights. See, *e. g.,* Act of Jan. 7, 1808, ch. 6, 6 Stat. 70 (patent); Act of Mar. 3, 1809, ch. 35, 6 Stat. 80 (patent); Act of Feb. 7, 1815, ch. 36, 6 Stat. 147 (patent); Act of May 24, 1828, ch. 145, 6 Stat. 389 (copyright); Act of Feb. 11, 1830, ch. 13, 6 Stat. 403 (copyright);

---

that legal monopoly ended in 1695, concerns about monopolistic practices remained, and the 18th-century English Parliament was resistant to any enhancement of booksellers' and publishers' entrenched position. See Rose, *supra,* at 52–56. In this country, in contrast, competition among publishers, printers, and booksellers was "intens[e]" at the time of the founding, and "there was not even a rough analog to the Stationers' Company on the horizon." Nachbar, Constructing Copyright's Mythology, 6 Green Bag 2d 37, 45 (2002). The Framers guarded against the future accumulation of monopoly power in booksellers and publishers by authorizing Congress to vest copyrights only in "Authors." JUSTICE STEVENS does not even attempt to explain how Parliament's response to England's experience with a publishing monopoly may be construed to impose a constitutional limitation on Congress' power to extend copyrights granted to "Authors."

[6] Moreover, the precise duration of a federal copyright has never been fixed at the time of the initial grant. The 1790 Act provided a federal copyright term of 14 years from the work's publication, renewable for an additional 14 years *if* the author survived and applied for an additional term. § 1. Congress retained that approach in subsequent statutes. See *Stewart* v. *Abend,* 495 U. S. 207, 217 (1990) ("Since the earliest copyright statute in this country, the copyright term of ownership has been split between an original term and a renewal term."). Similarly, under the method for measuring copyright terms established by the 1976 Act and retained by the CTEA, the baseline copyright term is measured in part by the life of the author, rendering its duration indeterminate at the time of the grant. See 1976 Act § 302(a); 17 U. S. C. § 302(a).

see generally Ochoa, Patent and Copyright Term Extension and the Constitution: A Historical Perspective, 49 J. Copyright Soc. 19 (2001). The courts saw no "limited Times" impediment to such extensions; renewed or extended terms were upheld in the early days, for example, by Chief Justice Marshall and Justice Story sitting as circuit justices. See *Evans* v. *Jordan*, 8 F. Cas. 872, 874 (No. 4,564) (CC Va. 1813) (Marshall, J.) ("Th[e] construction of the constitution which admits the renewal of a patent, is not controverted. A renewed patent . . . confers the same rights, with an original."), aff'd, 9 Cranch 199 (1815); *Blanchard* v. *Sprague*, 3 F. Cas. 648, 650 (No. 1,518) (CC Mass. 1839) (Story, J.) ("I never have entertained any doubt of the constitutional authority of congress" to enact a 14-year patent extension that "operates retrospectively"); see also *Evans* v. *Robinson*, 8 F. Cas. 886, 888 (No. 4,571) (CC Md. 1813) (Congresses "have the exclusive right . . . to limit the times for which a patent right shall be granted, and are not restrained from renewing a patent or prolonging" it.).[7]

Further, although prior to the instant case this Court did not have occasion to decide whether extending the duration of existing copyrights complies with the "limited Times" prescription, the Court has found no constitutional barrier to the legislative expansion of existing patents.[8] *McClurg* v.

---

[7] JUSTICE STEVENS would sweep away these decisions, asserting that *Graham* v. *John Deere Co. of Kansas City*, 383 U. S. 1 (1966), "flatly contradicts" them. *Post*, at 237. Nothing but wishful thinking underpins that assertion. The controversy in *Graham* involved no patent extension. *Graham* addressed an invention's very eligibility for patent protection, and spent no words on Congress' power to enlarge a patent's duration.

[8] JUSTICE STEVENS recites words from *Sears, Roebuck & Co.* v. *Stiffel Co.*, 376 U. S. 225 (1964), supporting the uncontroversial proposition that a State may not "extend the life of a patent beyond its expiration date," *id.*, at 231, then boldly asserts that for the same reasons Congress may not do so either. See *post*, at 222, 226. But *Sears* placed no reins on Congress' authority to extend a patent's life. The full sentence in *Sears*, from which JUSTICE STEVENS extracts words, reads: "Obviously a State could not,

*Kingsland*, 1 How. 202 (1843), is the pathsetting precedent. The patentee in that case was unprotected under the law in force when the patent issued because he had allowed his employer briefly to practice the invention before he obtained the patent. Only upon enactment, two years later, of an exemption for such allowances did the patent become valid, retroactive to the time it issued. *McClurg* upheld retroactive application of the new law. The Court explained that the legal regime governing a particular patent "depend[s] on the law as it stood at the emanation of the patent, together with such changes as have been since made; for though they may be retrospective in their operation, that is not a sound objection to their validity." *Id.*, at 206.[9] Neither is it a sound

---

consistently with the Supremacy Clause of the Constitution, extend the life of a patent beyond its expiration date or give a patent on an article which lacked the level of invention required for federal patents." 376 U. S., at 231. The point insistently made in *Sears* is no more and no less than this: *States* may not enact measures inconsistent with the federal patent laws. *Ibid.* ("[A] State cannot encroach upon the federal patent laws directly . . . [and] cannot . . . give protection of a kind that clashes with the objectives of the federal patent laws."). A decision thus rooted in the Supremacy Clause cannot be turned around to shrink congressional choices.

Also unavailing is JUSTICE STEVENS' appeal to language found in a private letter written by James Madison. *Post*, at 230, n. 6; see also dissenting opinion of BREYER, J., *post*, at 246–247, 260, 261. Respondent points to a better "demonstrat[ion]," *post*, at 226, n. 3 (STEVENS, J., dissenting), of Madison's and other Framers' understanding of the scope of Congress' power to extend patents: "[T]hen-President Thomas Jefferson—the first administrator of the patent system, and perhaps the Founder with the narrowest view of the copyright and patent powers—signed the 1808 and 1809 patent term extensions into law; . . . James Madison, who drafted the Constitution's 'limited Times' language, issued the extended patents under those laws as Secretary of State; and . . . Madison as President signed another patent term extension in 1815." Brief for Respondent 15.

[9] JUSTICE STEVENS reads *McClurg* to convey that "Congress cannot change the bargain between the public and the patentee in a way that disadvantages the patentee." *Post*, at 239. But *McClurg* concerned no

objection to the validity of a copyright term extension, enacted pursuant to the same constitutional grant of authority, that the enlarged term covers existing copyrights.

Congress' consistent historical practice of applying newly enacted copyright terms to future and existing copyrights reflects a judgment stated concisely by Representative Huntington at the time of the 1831 Act: "[J]ustice, policy, and equity alike forb[id]" that an "author who had sold his [work] a week ago, be placed in a worse situation than the author who should sell his work the day after the passing of [the] act." 7 Cong. Deb. 424 (1831); accord, Symposium, The Constitutionality of Copyright Term Extension, 18 Cardozo Arts & Ent. L. J. 651, 694 (2000) (Prof. Miller) ("[S]ince 1790, it has indeed been Congress's policy that the author of yesterday's work should not get a lesser reward than the author of tomorrow's work just because Congress passed a statute lengthening the term today."). The CTEA follows this historical practice by keeping the duration provisions of the 1976 Act largely in place and simply adding 20 years to each of them. Guided by text, history, and precedent, we cannot agree with petitioners' submission that extending the duration of existing copyrights is categorically beyond Congress' authority under the Copyright Clause.

Satisfied that the CTEA complies with the "limited Times" prescription, we turn now to whether it is a rational exercise of the legislative authority conferred by the Copyright Clause. On that point, we defer substantially to Congress.

---

such change. To the contrary, as JUSTICE STEVENS acknowledges, *McClurg* held that use of an invention by the patentee's employer did not invalidate the inventor's 1834 patent, "even if it might have had that effect prior to the amendment of the patent statute in 1836." *Post*, at 239. In other words, *McClurg* evaluated the patentee's rights not simply in light of the patent law in force at the time the patent issued, but also in light of "such changes as ha[d] been since made." 1 How., at 206. It is thus inescapably plain that *McClurg* upheld the application of expanded patent protection to an existing patent.

*Sony,* 464 U. S., at 429 ("[I]t is Congress that has been assigned the task of defining the scope of the limited monopoly that should be granted to authors . . . in order to give the public appropriate access to their work product.").[10]

The CTEA reflects judgments of a kind Congress typically makes, judgments we cannot dismiss as outside the Legislature's domain. As respondent describes, see Brief for Respondent 37–38, a key factor in the CTEA's passage was a 1993 European Union (EU) directive instructing EU members to establish a copyright term of life plus 70 years. EU Council Directive 93/98, Art. 1(1), p. 11; see 144 Cong. Rec. S12377–S12378 (daily ed. Oct. 12, 1998) (statement of Sen. Hatch). Consistent with the Berne Convention, the EU directed its members to deny this longer term to the works of any non-EU country whose laws did not secure the same extended term. See Berne Conv. Art. 7(8); P. Goldstein, International Copyright § 5.3, p. 239 (2001). By extending the baseline United States copyright term to life plus 70 years, Congress sought to ensure that American authors would re-

---

[10] JUSTICE BREYER would adopt a heightened, three-part test for the constitutionality of copyright enactments. *Post,* at 245. He would invalidate the CTEA as irrational in part because, in his view, harmonizing the United States and European Union baseline copyright terms "apparent[ly]" fails to achieve "significant" uniformity. *Post,* at 264. But see *infra* this page and 206. The novelty of the "rational basis" approach he presents is plain. Cf. *Board of Trustees of Univ. of Ala.* v. *Garrett,* 531 U. S. 356, 383 (2001) (BREYER, J., dissenting) ("Rational-basis review— with its presumptions favoring constitutionality—is 'a paradigm of *judicial* restraint.'" (quoting *FCC* v. *Beach Communications, Inc.,* 508 U. S. 307, 314 (1993))). Rather than subjecting Congress' legislative choices in the copyright area to heightened judicial scrutiny, we have stressed that "it is not our role to alter the delicate balance Congress has labored to achieve." *Stewart* v. *Abend,* 495 U. S., at 230; see *Sony Corp. of America* v. *Universal City Studios, Inc.,* 464 U. S. 417, 429 (1984). Congress' exercise of its Copyright Clause authority must be rational, but JUSTICE BREYER's stringent version of rationality is unknown to our literary property jurisprudence.

ceive the same copyright protection in Europe as their European counterparts.[11]   The CTEA may also provide greater incentive for American and other authors to create and disseminate their work in the United States.   See Perlmutter, Participation in the International Copyright System as a Means to Promote the Progress of Science and Useful Arts, 36 Loyola (LA) L. Rev. 323, 330 (2002) ("[M]atching th[e] level of [copyright] protection in the United States [to that in the EU] can ensure stronger protection for U. S. works abroad and avoid competitive disadvantages vis-à-vis foreign rightholders."); see also id., at 332 (the United States could not "play a leadership role" in the give-and-take evolution of the international copyright system, indeed it would "lose all flexibility," "if the only way to promote the progress of science were to provide incentives to create new works").[12]

In addition to international concerns,[13] Congress passed the CTEA in light of demographic, economic, and technologi-

---

[11] Responding to an inquiry whether copyrights could be extended "forever," Register of Copyrights Marybeth Peters emphasized the dominant reason for the CTEA: "There certainly are proponents of perpetual copyright: We heard that in our proceeding on term extension.   The Songwriters Guild suggested a perpetual term.   However, our Constitution says limited times, but there really isn't a very good indication on what limited times is.   The reason why you're going to life-plus-70 today is because Europe has gone that way . . . ."   Copyright Term, Film Labeling, and Film Preservation Legislation: Hearings on H. R. 989 et al. before the Subcommittee on Courts and Intellectual Property of the House Committee on the Judiciary, 104th Cong., 1st Sess., 230 (1995) (hereinafter House Hearings).

[12] The author of the law review article cited in text, Shira Perlmutter, currently a vice president of AOL Time Warner, was at the time of the CTEA's enactment Associate Register for Policy and International Affairs, United States Copyright Office.

[13] See also Austin, Does the Copyright Clause Mandate Isolationism? 26 Colum. J. L. & Arts 17, 59 (2002) (cautioning against "an isolationist reading of the Copyright Clause that is in tension with . . . America's international copyright relations over the last hundred or so years").

cal changes, Brief for Respondent 25–26, 33, and nn. 23 and 24,[14] and rationally credited projections that longer terms would encourage copyright holders to invest in the restoration and public distribution of their works, *id.*, at 34–37; see H. R. Rep. No. 105–452, p. 4 (1998) (term extension "provide[s] copyright owners generally with the incentive to restore older works and further disseminate them to the public").[15]

---

[14] Members of Congress expressed the view that, as a result of increases in human longevity and in parents' average age when their children are born, the pre-CTEA term did not adequately secure "the right to profit from licensing one's work during one's lifetime and to take pride and comfort in knowing that one's children—and perhaps their children—might also benefit from one's posthumous popularity." 141 Cong. Rec. 6553 (1995) (statement of Sen. Feinstein); see 144 Cong. Rec. S12377 (daily ed. Oct. 12, 1998) (statement of Sen. Hatch) ("Among the main developments [compelling reconsideration of the 1976 Act's term] is the effect of demographic trends, such as increasing longevity and the trend toward rearing children later in life, on the effectiveness of the life-plus-50 term to provide adequate protection for American creators and their heirs."). Also cited was "the failure of the U. S. copyright term to keep pace with the substantially increased commercial life of copyrighted works resulting from the rapid growth in communications media." *Ibid.* (statement of Sen. Hatch); cf. *Sony,* 464 U. S., at 430–431 ("From its beginning, the law of copyright has developed in response to significant changes in technology. . . . [A]s new developments have occurred in this country, it has been the Congress that has fashioned the new rules that new technology made necessary.").

[15] JUSTICE BREYER urges that the economic incentives accompanying copyright term extension are too insignificant to "mov[e]" any author with a "rational economic perspective." *Post,* at 255; see *post,* at 254–257. Calibrating rational economic incentives, however, like "fashion[ing] . . . new rules [in light of] new technology," *Sony,* 464 U. S., at 431, is a task primarily for Congress, not the courts. Congress heard testimony from a number of prominent artists; each expressed the belief that the copyright system's assurance of fair compensation for themselves and their heirs was an incentive to create. See, *e. g.,* House Hearings 233–239 (statement of Quincy Jones); Copyright Term Extension Act of 1995: Hearing before the Senate Committee on the Judiciary, 104th Cong., 1st Sess., 55–56 (1995)

In sum, we find that the CTEA is a rational enactment; we are not at liberty to second-guess congressional determinations and policy judgments of this order, however debatable or arguably unwise they may be. Accordingly, we cannot conclude that the CTEA—which continues the unbroken congressional practice of treating future and existing copyrights in parity for term extension purposes—is an impermissible exercise of Congress' power under the Copyright Clause.

### B

Petitioners' Copyright Clause arguments rely on several novel readings of the Clause. We next address these arguments and explain why we find them unpersuasive.

### 1

Petitioners contend that even if the CTEA's 20-year term extension is literally a "limited Tim[e]," permitting Congress to extend existing copyrights allows it to evade the "limited Times" constraint by creating effectively perpetual copyrights through repeated extensions. We disagree.

---

(statement of Bob Dylan); *id.*, at 56–57 (statement of Don Henley); *id.*, at 57 (statement of Carlos Santana). We would not take Congress to task for crediting this evidence which, as JUSTICE BREYER acknowledges, reflects general "propositions about the value of incentives" that are "undeniably true." *Post*, at 255.

Congress also heard testimony from Register of Copyrights Marybeth Peters and others regarding the economic incentives created by the CTEA. According to the Register, extending the copyright for existing works "could . . . provide additional income that would finance the production and publication of new works." House Hearings 158. "Authors would not be able to continue to create," the Register explained, "unless they earned income on their finished works. The public benefits not only from an author's original work but also from his or her further creations. Although this truism may be illustrated in many ways, one of the best examples is Noah Webster[,] who supported his entire family from the earnings on his speller and grammar during the twenty years he took to complete his dictionary." *Id.*, at 165.

As the Court of Appeals observed, a regime of perpetual copyrights "clearly is not the situation before us." 239 F. 3d, at 379. Nothing before this Court warrants construction of the CTEA's 20-year term extension as a congressional attempt to evade or override the "limited Times" constraint.[16] Critically, we again emphasize, petitioners fail to

---

[16] JUSTICE BREYER agrees that "Congress did not intend to act unconstitutionally" when it enacted the CTEA, *post*, at 256, yet in his very next breath, he seems to make just that accusation, *ibid.* What else is one to glean from his selection of scattered statements from individual Members of Congress? He does not identify any statement in the statutory text that installs a perpetual copyright, for there is none. But even if the statutory text were sufficiently ambiguous to warrant recourse to legislative history, JUSTICE BREYER'S selections are not the sort to which this Court accords high value: "In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those [Members of Congress] involved in drafting and studying proposed legislation.'" *Garcia* v. *United States,* 469 U. S. 70, 76 (1984) (quoting *Zuber* v. *Allen,* 396 U. S. 168, 186 (1969)). The House and Senate Reports accompanying the CTEA reflect no purpose to make copyright a forever thing. Notably, the Senate Report expressly acknowledged that the Constitution "clearly precludes Congress from granting unlimited protection for copyrighted works," S. Rep. No. 104–315, p. 11 (1996), and disclaimed any intent to contravene that prohibition, *ibid.* Members of Congress instrumental in the CTEA's passage spoke to similar effect. See, *e. g.,* 144 Cong. Rec. H1458 (daily ed. Mar. 25, 1998) (statement of Rep. Coble) (observing that "copyright protection should be for a limited time only" and that "[p]erpetual protection does not benefit society").

JUSTICE BREYER nevertheless insists that the "economic effect" of the CTEA is to make the copyright term "virtually perpetual." *Post,* at 243. Relying on formulas and assumptions provided in an *amicus* brief supporting petitioners, he stresses that the CTEA creates a copyright term worth 99.8% of the value of a perpetual copyright. *Post,* at 254–256. If JUSTICE BREYER's calculations were a basis for holding the CTEA unconstitutional, then the 1976 Act would surely fall as well, for—under the same assumptions he indulges—the term set by that Act secures 99.4% of the value of a perpetual term. See Brief for George A. Akerlof et al. as *Amici Curiae* 6, n. 6 (describing the relevant formula). Indeed, on that analysis even the "limited" character of the 1909 (97.7%) and 1831 (94.1%)

show how the CTEA crosses a constitutionally significant threshold with respect to "limited Times" that the 1831, 1909, and 1976 Acts did not. See *supra*, at 194–196; Austin, *supra* n. 13, at 56 ("If extending copyright protection to works already in existence is constitutionally suspect," so is "extending the protections of U. S. copyright law to works by foreign authors that had already been created and even first published when the federal rights attached."). Those earlier Acts did not create perpetual copyrights, and neither does the CTEA.[17]

2

Petitioners dominantly advance a series of arguments all premised on the proposition that Congress may not extend an existing copyright absent new consideration from the author. They pursue this main theme under three headings. Petitioners contend that the CTEA's extension of existing copyrights (1) overlooks the requirement of "originality," (2) fails to "promote the Progress of Science," and (3) ignores copyright's *quid pro quo.*

---

Acts might be suspect. JUSTICE BREYER several times places the Founding Fathers on his side. See, *e. g., post,* at 246–247, 260, 261. It is doubtful, however, that those architects of our Nation, in framing the "limited Times" prescription, thought in terms of the calculator rather than the calendar.

[17] Respondent notes that the CTEA's life-plus-70-years baseline term is expected to produce an average copyright duration of 95 years, and that this term "resembles some other long-accepted durational practices in the law, such as 99-year leases of real property and bequests within the rule against perpetuities." Brief for Respondent 27, n. 18. Whether such referents mark the outer boundary of "limited Times" is not before us today. JUSTICE BREYER suggests that the CTEA's baseline term extends beyond that typically permitted by the traditional rule against perpetuities. *Post,* at 256–257. The traditional common-law rule looks to lives in being plus 21 years. Under that rule, the period before a bequest vests could easily equal or exceed the anticipated average copyright term under the CTEA. If, for example, the vesting period on a deed were defined with reference to the life of an infant, the sum of the measuring life plus 21 years could commonly add up to 95 years.

Petitioners' "originality" argument draws on *Feist Publications, Inc.* v. *Rural Telephone Service Co.*, 499 U. S. 340 (1991). In *Feist*, we observed that "[t]he *sine qua non* of copyright is originality," *id.*, at 345, and held that copyright protection is unavailable to "a narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent," *id.*, at 359. Relying on *Feist*, petitioners urge that even if a work is sufficiently "original" to qualify for copyright protection in the first instance, any extension of the copyright's duration is impermissible because, once published, a work is no longer original.

*Feist*, however, did not touch on the duration of copyright protection. Rather, the decision addressed the core question of copyrightability, *i. e.*, the "creative spark" a work must have to be eligible for copyright protection at all. Explaining the originality requirement, *Feist* trained on the Copyright Clause words "Authors" and "Writings." *Id.*, at 346–347. The decision did not construe the "limited Times" for which a work may be protected, and the originality requirement has no bearing on that prescription.

More forcibly, petitioners contend that the CTEA's extension of existing copyrights does not "promote the Progress of Science" as contemplated by the preambular language of the Copyright Clause. Art. I, § 8, cl. 8. To sustain this objection, petitioners do not argue that the Clause's preamble is an independently enforceable limit on Congress' power. See 239 F. 3d, at 378 (Petitioners acknowledge that "the preamble of the Copyright Clause is not a substantive limit on Congress' legislative power." (internal quotation marks omitted)). Rather, they maintain that the preambular language identifies the sole end to which Congress may legislate; accordingly, they conclude, the meaning of "limited Times" must be "determined in light of that specified end." Brief for Petitioners 19. The CTEA's extension of existing copyrights categorically fails to "promote the Progress of Science," petitioners argue, because it does not stimulate the

creation of new works but merely adds value to works already created.

As petitioners point out, we have described the Copyright Clause as "both a grant of power and a limitation," *Graham v. John Deere Co. of Kansas City,* 383 U. S. 1, 5 (1966), and have said that "[t]he primary objective of copyright" is "[t]o promote the Progress of Science," *Feist,* 499 U. S., at 349. The "constitutional command," we have recognized, is that Congress, to the extent it enacts copyright laws at all, create a "system" that "promote[s] the Progress of Science." *Graham,* 383 U. S., at 6.[18]

We have also stressed, however, that it is generally for Congress, not the courts, to decide how best to pursue the Copyright Clause's objectives. See *Stewart* v. *Abend,* 495 U. S., at 230 ("Th[e] evolution of the duration of copyright protection tellingly illustrates the difficulties Congress faces . . . . [I]t is not our role to alter the delicate balance

---

[18] JUSTICE STEVENS' characterization of reward to the author as "a secondary consideration" of copyright law, *post,* at 227, n. 4 (internal quotation marks omitted), understates the relationship between such rewards and the "Progress of Science." As we have explained, "[t]he economic philosophy behind the [Copyright] [C]lause . . . is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors." *Mazer* v. *Stein,* 347 U. S. 201, 219 (1954). Accordingly, "copyright law *celebrates* the profit motive, recognizing that the incentive to profit from the exploitation of copyrights will redound to the public benefit by resulting in the proliferation of knowledge. . . . The profit motive is the engine that ensures the progress of science." *American Geophysical Union* v. *Texaco Inc.,* 802 F. Supp. 1, 27 (SDNY 1992), aff'd, 60 F. 3d 913 (CA2 1994). Rewarding authors for their creative labor and "promot[ing] . . . Progress" are thus complementary; as James Madison observed, in copyright "[t]he public good fully coincides . . . with the claims of individuals." The Federalist No. 43, p. 272 (C. Rossiter ed. 1961). JUSTICE BREYER's assertion that "copyright statutes must serve public, not private, ends," *post,* at 247, similarly misses the mark. The two ends are not mutually exclusive; copyright law serves public ends by providing individuals with an incentive to pursue private ones.

Congress has labored to achieve."); *Sony,* 464 U. S., at 429 ("[I]t is Congress that has been assigned the task of defining the scope of [rights] that should be granted to authors or to inventors in order to give the public appropriate access to their work product."); *Graham,* 383 U. S., at 6 ("Within the limits of the constitutional grant, the Congress may, of course, implement the stated purpose of the Framers by selecting the policy which in its judgment best effectuates the constitutional aim."). The justifications we earlier set out for Congress' enactment of the CTEA, *supra,* at 205–207, provide a rational basis for the conclusion that the CTEA "promote[s] the Progress of Science."

On the issue of copyright duration, Congress, from the start, has routinely applied new definitions or adjustments of the copyright term to both future works and existing works not yet in the public domain.[19] Such consistent congressional practice is entitled to "very great weight, and when it is remembered that the rights thus established have not been disputed during a period of [over two] centur[ies], it is almost conclusive." *Burrow-Giles Lithographic Co.* v. *Sarony,* 111 U. S., at 57. Indeed, "[t]his Court has repeatedly laid down the principle that a contemporaneous legislative exposition of the Constitution when the founders of our Government and framers of our Constitution were actively participating in public affairs, acquiesced in for a long term of years, fixes the construction to be given [the Constitution's] provisions." *Myers* v. *United States,* 272 U. S. 52, 175 (1926). Congress' unbroken practice since the founding gen-

---

[19] As we have noted, see *supra,* at 196, n. 3, petitioners seek to distinguish the 1790 Act from those that followed. They argue that by requiring authors seeking its protection to surrender whatever rights they had under state law, the 1790 Act enhanced uniformity and certainty and thus "promote[d] . . . Progress." See Brief for Petitioners 28–31. This account of the 1790 Act simply confirms, however, that the First Congress understood it could "promote . . . Progress" by extending copyright protection to existing works. Every subsequent adjustment of copyright's duration, including the CTEA, reflects a similar understanding.

eration thus overwhelms petitioners' argument that the CTEA's extension of existing copyrights fails *per se* to "promote the Progress of Science."[20]

Closely related to petitioners' preambular argument, or a variant of it, is their assertion that the Copyright Clause "imbeds a quid pro quo." Brief for Petitioners 23. They contend, in this regard, that Congress may grant to an "Autho[r]" an "exclusive Right" for a "limited Tim[e]," but only in exchange for a "Writin[g]." Congress' power to confer copyright protection, petitioners argue, is thus contingent upon an exchange: The author of an original work receives an "exclusive Right" for a "limited Tim[e]" in exchange for a dedication to the public thereafter. Extending an existing copyright without demanding additional consideration, petitioners maintain, bestows an unpaid-for benefit on copyright holders and their heirs, in violation of the *quid pro quo* requirement.

We can demur to petitioners' description of the Copyright Clause as a grant of legislative authority empowering Congress "to secure a bargain—this for that." *Id.*, at 16; see *Mazer* v. *Stein*, 347 U. S. 201, 219 (1954) ("The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.' "). But the legislative evolution earlier recalled demonstrates what the bargain entails. Given the consistent placement of existing copyright

---

[20] JUSTICE STEVENS, *post*, at 235, refers to the "legislative veto" held unconstitutional in *INS* v. *Chadha*, 462 U. S. 919 (1983), and observes that we reached that decision despite its impact on federal laws geared to our "contemporary political system," *id.*, at 967 (White, J., dissenting). Placing existing works in parity with future works for copyright purposes, in contrast, is not a similarly pragmatic endeavor responsive to modern times. It is a measure of the kind Congress has enacted under its Patent and Copyright Clause authority since the founding generation. See *supra*, at 194–196.

holders in parity with future holders, the author of a work created in the last 170 years would reasonably comprehend, as the "this" offered her, a copyright not only for the time in place when protection is gained, but also for any renewal or extension legislated during that time.[21] Congress could rationally seek to "promote . . . Progress" by including in every copyright statute an express guarantee that authors would receive the benefit of any later legislative extension of the copyright term. Nothing in the Copyright Clause bars Congress from creating the same incentive by adopting the same position as a matter of unbroken practice. See Brief for Respondent 31–32.

Neither *Sears, Roebuck & Co.* v. *Stiffel Co.*, 376 U. S. 225 (1964), nor *Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*, 489 U. S. 141 (1989), is to the contrary. In both cases, we invalidated the application of certain state laws as inconsistent with the federal patent regime. *Sears*, 376 U. S., at 231–233; *Bonito*, 489 U. S., at 152. Describing Congress' constitutional authority to confer patents, *Bonito Boats* noted: "The Patent Clause itself reflects a balance between the need to encourage innovation and the avoidance of monopolies which stifle competition without any concomitant advance in the 'Progress of Science and useful Arts.'" *Id.*, at 146.

---

[21] Standard copyright assignment agreements reflect this expectation. See, *e. g.*, A. Kohn & B. Kohn, Music Licensing 471 (3d ed. 1992–2002) (short form copyright assignment for musical composition, under which assignor conveys all rights to the work, "including the copyrights and proprietary rights therein and in any and all versions of said musical composition(s), and any renewals and extensions thereof (whether presently available *or subsequently available as a result of intervening legislation)*" (emphasis added)); 5 M. Nimmer & D. Nimmer, Copyright § 21.11[B], p. 21–305 (2002) (short form copyright assignment under which assignor conveys all assets relating to the work, "including without limitation, copyrights and renewals and/or extensions thereof"); 6 *id.*, § 30.04[B][1], p. 30–325 (form composer-producer agreement under which composer "assigns to Producer all rights (copyrights, rights under copyright and otherwise, whether now or hereafter known) and all renewals and extensions (as may now or hereafter exist)").

*Sears* similarly stated that "[p]atents are not given as favors . . . but are meant to encourage invention by rewarding the inventor with the right, limited to a term of years fixed by the patent, to exclude others from the use of his invention." 376 U. S., at 229. Neither case concerned the extension of a patent's duration. Nor did either suggest that such an extension might be constitutionally infirm. Rather, *Bonito Boats* reiterated the Court's unclouded understanding: "It is for Congress to determine if the present system" effectuates the goals of the Copyright and Patent Clause. 489 U. S., at 168. And as we have documented, see *supra,* at 201–204, Congress has many times sought to effectuate those goals by extending existing patents.

We note, furthermore, that patents and copyrights do not entail the same exchange, and that our references to a *quid pro quo* typically appear in the patent context. See, *e. g., J. E. M. Ag Supply, Inc.* v. *Pioneer Hi-Bred International, Inc.,* 534 U. S. 124, 142 (2001) ("The disclosure required by the Patent Act is 'the *quid pro quo* of the right to exclude.'" (quoting *Kewanee Oil Co.* v. *Bicron Corp.,* 416 U. S. 470, 484 (1974))); *Bonito Boats,* 489 U. S., at 161 ("the *quid pro quo* of substantial creative effort required by the federal [patent] statute"); *Brenner* v. *Manson,* 383 U. S. 519, 534 (1966) ("The basic *quid pro quo* . . . for granting a patent monopoly is the benefit derived by the public from an invention with substantial utility."); *Pennock* v. *Dialogue,* 2 Pet. 1, 23 (1829) (If an invention is already commonly known and used when the patent is sought, "there might be sound reason for presuming, that the legislature did not intend to grant an exclusive right," given the absence of a *"quid pro quo."*). This is understandable, given that immediate disclosure is not the objective of, but is *exacted from,* the patentee. It is the price paid for the exclusivity secured. See *J. E. M. Ag Supply,* 534 U. S., at 142. For the author seeking copyright protection, in contrast, disclosure is the desired objective, not something exacted from the author in exchange for the copy-

right. Indeed, since the 1976 Act, copyright has run from creation, not publication. See 1976 Act § 302(a); 17 U. S. C. § 302(a).

Further distinguishing the two kinds of intellectual property, copyright gives the holder no monopoly on any knowledge. A reader of an author's writing may make full use of any fact or idea she acquires from her reading. See § 102(b). The grant of a patent, on the other hand, does prevent full use by others of the inventor's knowledge. See Brief for Respondent 22; *Alfred Bell & Co.* v. *Catalda Fine Arts*, 191 F. 2d 99, 103, n. 16 (CA2 1951) (The monopoly granted by a copyright "is not a monopoly of knowledge. The grant of a patent does prevent full use being made of knowledge, but the reader of a book is not by the copyright laws prevented from making full use of any information he may acquire from his reading." (quoting W. Copinger, Law of Copyright 2 (7th ed. 1936))). In light of these distinctions, one cannot extract from language in our patent decisions—language not trained on a grant's duration—genuine support for petitioners' bold view. Accordingly, we reject the proposition that a *quid pro quo* requirement stops Congress from expanding copyright's term in a manner that puts existing and future copyrights in parity.[22]

3

As an alternative to their various arguments that extending existing copyrights violates the Copyright Clause *per se,* petitioners urge heightened judicial review of such extensions to ensure that they appropriately pursue the purposes of the Clause. See Brief for Petitioners 31–32. Specifically,

---

[22] The fact that patent and copyright involve different exchanges does not, of course, mean that we may not be guided in our "limited Times" analysis by Congress' repeated extensions of existing patents. See *supra,* at 201–204. If patent's *quid pro quo* is more exacting than copyright's, then Congress' repeated extension of existing patents without constitutional objection suggests even more strongly that similar legislation with respect to copyrights is constitutionally permissible.

petitioners ask us to apply the "congruence and proportionality" standard described in cases evaluating exercises of Congress' power under § 5 of the Fourteenth Amendment. See, e. g., *City of Boerne* v. *Flores*, 521 U. S. 507 (1997). But we have never applied that standard outside the § 5 context; it does not hold sway for judicial review of legislation enacted, as copyright laws are, pursuant to Article I authorization.

Section 5 authorizes Congress to *enforce* commands contained in and incorporated into the Fourteenth Amendment. Amdt. 14, § 5 ("The Congress shall have power to *enforce*, by appropriate legislation, the provisions of this article." (emphasis added)). The Copyright Clause, in contrast, empowers Congress to *define* the scope of the substantive right. See *Sony*, 464 U. S., at 429. Judicial deference to such congressional definition is "but a corollary to the grant to Congress of any Article I power." *Graham*, 383 U. S., at 6. It would be no more appropriate for us to subject the CTEA to "congruence and proportionality" review under the Copyright Clause than it would be for us to hold the Act unconstitutional *per se.*

For the several reasons stated, we find no Copyright Clause impediment to the CTEA's extension of existing copyrights.

## III

Petitioners separately argue that the CTEA is a content-neutral regulation of speech that fails heightened judicial review under the First Amendment.[23] We reject petitioners'

---

[23] Petitioners originally framed this argument as implicating the CTEA's extension of both existing and future copyrights. See Pet. for Cert. i. Now, however, they train on the CTEA's extension of existing copyrights and urge against consideration of the CTEA's First Amendment validity as applied to future copyrights. See Brief for Petitioners 39–48; Reply Brief 16–17; Tr. of Oral Arg. 11–13. We therefore consider petitioners' argument as so limited. We note, however, that petitioners do not explain how their First Amendment argument is moored to the prospective/retrospective line they urge us to draw, nor do they say whether or how their

plea for imposition of uncommonly strict scrutiny on a copyright scheme that incorporates its own speech-protective purposes and safeguards. The Copyright Clause and First Amendment were adopted close in time. This proximity indicates that, in the Framers' view, copyright's limited monopolies are compatible with free speech principles. Indeed, copyright's purpose is to *promote* the creation and publication of free expression. As *Harper & Row* observed: "[T]he Framers intended copyright itself to be the engine of free expression. By establishing a marketable right to the use of one's expression, copyright supplies the economic incentive to create and disseminate ideas." 471 U. S., at 558.

In addition to spurring the creation and publication of new expression, copyright law contains built-in First Amendment accommodations. See *id.*, at 560. First, it distinguishes between ideas and expression and makes only the latter eligible for copyright protection. Specifically, 17 U. S. C. § 102(b) provides: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." As we said in *Harper & Row*, this "idea/expression dichotomy strike[s] a definitional balance between the First Amendment and the Copyright Act by permitting free communication of facts while still protecting an author's expression." 471 U. S., at 556 (internal quotation marks omitted). Due to this distinction, every idea, theory, and fact in a copyrighted work becomes instantly available for public exploitation at the moment of publication. See *Feist*, 499 U. S., at 349–350.

Second, the "fair use" defense allows the public to use not only facts and ideas contained in a copyrighted work, but also expression itself in certain circumstances. Codified at 17 U. S. C. § 107, the defense provides: "[T]he fair use of a

free speech argument applies to copyright duration but not to other aspects of copyright protection, notably scope.

copyrighted work, including such use by reproduction in copies . . . , for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright." The fair use defense affords considerable "latitude for scholarship and comment," *Harper & Row,* 471 U. S., at 560, and even for parody, see *Campbell* v. *Acuff-Rose Music, Inc.,* 510 U. S. 569 (1994) (rap group's musical parody of Roy Orbison's "Oh, Pretty Woman" may be fair use).

The CTEA itself supplements these traditional First Amendment safeguards. First, it allows libraries, archives, and similar institutions to "reproduce" and "distribute, display, or perform in facsimile or digital form" copies of certain published works "during the last 20 years of any term of copyright . . . for purposes of preservation, scholarship, or research" if the work is not already being exploited commercially and further copies are unavailable at a reasonable price. 17 U. S. C. § 108(h); see Brief for Respondent 36. Second, Title II of the CTEA, known as the Fairness in Music Licensing Act of 1998, exempts small businesses, restaurants, and like entities from having to pay performance royalties on music played from licensed radio, television, and similar facilities. 17 U. S. C. § 110(5)(B); see Brief for Representative F. James Sensenbrenner, Jr., et al. as *Amici Curiae* 5–6, n. 3.

Finally, the case petitioners principally rely upon for their First Amendment argument, *Turner Broadcasting System, Inc.* v. *FCC,* 512 U. S. 622 (1994), bears little on copyright. The statute at issue in *Turner* required cable operators to carry and transmit broadcast stations through their proprietary cable systems. Those "must-carry" provisions, we explained, implicated "the heart of the First Amendment," namely, "the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." *Id.,* at 641.

The CTEA, in contrast, does not oblige anyone to reproduce another's speech against the carrier's will. Instead, it protects authors' original expression from unrestricted exploitation. Protection of that order does not raise the free speech concerns present when the government compels or burdens the communication of particular facts or ideas. The First Amendment securely protects the freedom to make— or decline to make—one's own speech; it bears less heavily when speakers assert the right to make other people's speeches. To the extent such assertions raise First Amendment concerns, copyright's built-in free speech safeguards are generally adequate to address them. We recognize that the D. C. Circuit spoke too broadly when it declared copyrights "categorically immune from challenges under the First Amendment." 239 F. 3d, at 375. But when, as in this case, Congress has not altered the traditional contours of copyright protection, further First Amendment scrutiny is unnecessary. See *Harper & Row*, 471 U. S., at 560; cf. *San Francisco Arts & Athletics, Inc.* v. *United States Olympic Comm.*, 483 U. S. 522 (1987).[24]

## IV

If petitioners' vision of the Copyright Clause held sway, it would do more than render the CTEA's duration extensions unconstitutional as to existing works. Indeed, petitioners' assertion that the provisions of the CTEA are not severable would make the CTEA's enlarged terms invalid even as to

---

[24] We are not persuaded by petitioners' attempt to distinguish *Harper & Row* on the ground that it involved an infringement suit rather than a declaratory action of the kind here presented. As respondent observes, the same legal question can arise in either posture. See Brief for Respondent 42. In both postures, it is appropriate to construe copyright's internal safeguards to accommodate First Amendment concerns. Cf. *United States* v. *X-Citement Video, Inc.*, 513 U. S. 64, 78 (1994) ("It is . . . incumbent upon us to read the statute to eliminate [serious constitutional] doubts so long as such a reading is not plainly contrary to the intent of Congress.").

tomorrow's work. The 1976 Act's time extensions, which set the pattern that the CTEA followed, would be vulnerable as well.

As we read the Framers' instruction, the Copyright Clause empowers Congress to determine the intellectual property regimes that, overall, in that body's judgment, will serve the ends of the Clause. See *Graham*, 383 U. S., at 6 (Congress may "implement the stated purpose of the Framers by selecting the policy which *in its judgment* best effectuates the constitutional aim." (emphasis added)). Beneath the facade of their inventive constitutional interpretation, petitioners forcefully urge that Congress pursued very bad policy in prescribing the CTEA's long terms. The wisdom of Congress' action, however, is not within our province to second-guess. Satisfied that the legislation before us remains inside the domain the Constitution assigns to the First Branch, we affirm the judgment of the Court of Appeals.

*It is so ordered.*

JUSTICE STEVENS, dissenting.

Writing for a unanimous Court in 1964, Justice Black stated that it is obvious that a State could not "extend the life of a patent beyond its expiration date," *Sears, Roebuck & Co.* v. *Stiffel Co.*, 376 U. S. 225, 231 (1964).[1] As I shall explain, the reasons why a State may not extend the life of a patent apply to Congress as well. If Congress may not expand the scope of a patent monopoly, it also may not extend

---

[1] Justice Harlan wrote a brief concurrence, but did not disagree with this statement. Justice Black's statement echoed a portion of Attorney General Wirt's argument in *Gibbons* v. *Ogden*, 9 Wheat. 1, 171 (1824): "The law of Congress declares, that all inventors of useful improvements throughout the United States, shall be entitled to the exclusive right in their discoveries for fourteen years *only*. The law of New-York declares, that this inventor shall be entitled to the exclusive use of his discovery for thirty years, and as much longer as the State shall permit. The law of Congress, by limiting the exclusive right to fourteen years, in effect declares, that after the expiration of that time, the discovery shall be the common right of the whole people of the United States."

the life of a copyright beyond its expiration date. Accordingly, insofar as the 1998 Sonny Bono Copyright Term Extension Act, 112 Stat. 2827, purported to extend the life of unexpired copyrights, it is invalid. Because the majority's contrary conclusion rests on the mistaken premise that this Court has virtually no role in reviewing congressional grants of monopoly privileges to authors, inventors, and their successors, I respectfully dissent.

I

The authority to issue copyrights stems from the same Clause in the Constitution that created the patent power. It provides:

> "Congress shall have Power . . . To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." Art. I, § 8, cl. 8.

It is well settled that the Clause is "both a grant of power and a limitation" and that Congress "may not overreach the restraints imposed by the stated constitutional purpose." *Graham* v. *John Deere Co. of Kansas City*, 383 U. S. 1, 5–6 (1966). As we have made clear in the patent context, that purpose has two dimensions. Most obviously the grant of exclusive rights to their respective writings and discoveries is intended to encourage the creativity of "Authors and Inventors." But the requirement that those exclusive grants be for "limited Times" serves the ultimate purpose of promoting the "Progress of Science and useful Arts" by guaranteeing that those innovations will enter the public domain as soon as the period of exclusivity expires:

> "Once the patent issues, it is strictly construed, *United States* v. *Masonite Corp.*, 316 U. S. 265, 280 (1942), it cannot be used to secure any monopoly beyond that contained in the patent, *Morton Salt Co.* v. *G. S. Suppiger Co.*, 314 U. S. 488, 492 (1942), . . . and especially relevant

here, when the patent expires the monopoly created by it expires, too, and the right to make the article—including the right to make it in precisely the shape it carried when patented—passes to the public. *Kellogg Co.* v. *National Biscuit Co.*, 305 U. S. 111, 120–122 (1938); *Singer Mfg. Co.* v. *June Mfg. Co.*, 163 U. S. 169, 185 (1896)." *Sears, Roebuck & Co.*, 376 U. S., at 230.

It is that ultimate purpose that explains why a patent may not issue unless it discloses the invention in such detail that one skilled in the art may copy it. See, *e. g., Grant* v. *Raymond*, 6 Pet. 218, 247 (1832) (Marshall, C. J.) ("The third section [of the 1793 Act] requires, as preliminary to a patent, a correct specification and description of the thing discovered. This is necessary in order to give the public, after the privilege shall expire, the advantage for which the privilege is allowed, and is the foundation of the power to issue the patent"). Complete disclosure as a precondition to the issuance of a patent is part of the *quid pro quo* that justifies the limited monopoly for the inventor as consideration for full and immediate access by the public when the limited time expires.[2]

Almost two centuries ago the Court plainly stated that public access to inventions at the earliest possible date was the essential purpose of the Clause:

"While one great object was, by holding out a reasonable reward to inventors and giving them an exclusive right to their inventions for a limited period, to stimulate the efforts of genius; the main object was 'to promote the

---

[2] Attorney General Wirt made this precise point in his argument in *Gibbons* v. *Ogden*, 9 Wheat., at 175: "The limitation is not for the advantage of the inventor, but of society at large, which is to take the benefit of the invention after the period of limitation has expired. The patentee pays a duty on his patent, which is an effective source of revenue to the United States. It is virtually a contract between each patentee and the people of the United States, by which the time of exclusive and secure enjoyment is limited, and then the benefit of the discovery results to the public."

progress of science and useful arts;' and this could be done best, by giving the public at large a right to make, construct, use, and vend the thing invented, at as early a period as possible, having a due regard to the rights of the inventor. If an inventor should be permitted to hold back from the knowledge of the public the secrets of his invention; if he should for a long period of years retain the monopoly, and make, and sell his invention publicly, and thus gather the whole profits of it, relying upon his superior skill and knowledge of the structure; and then, and then only, when the danger of competition should force him to secure the exclusive right, he should be allowed to take out a patent, and thus exclude the public from any farther use than what should be derived under it during his fourteen years; it would materially retard the progress of science and the useful arts, and give a premium to those, who should be least prompt to communicate their discoveries." *Pennock* v. *Dialogue*, 2 Pet. 1, 18 (1829).

*Pennock* held that an inventor could not extend the period of patent protection by postponing his application for the patent while exploiting the invention commercially. As we recently explained, "implicit in the Patent Clause itself" is the understanding "that free exploitation of ideas will be the rule, to which the protection of a federal patent is the exception. Moreover, the ultimate goal of the patent system is to bring new designs and technologies into the public domain through disclosure." *Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*, 489 U. S. 141, 151 (1989).

The issuance of a patent is appropriately regarded as a *quid pro quo*—the grant of a limited right for the inventor's disclosure and subsequent contribution to the public domain. See, *e. g., Pfaff* v. *Wells Electronics, Inc.*, 525 U. S. 55, 63 (1998) ("[T]he patent system represents a carefully crafted bargain that encourages both the creation and the public disclosure of new and useful advances in technology, in return

for an exclusive monopoly for a limited period of time"). It would be manifestly unfair if, after issuing a patent, the Government as a representative of the public sought to modify the bargain by shortening the term of the patent in order to accelerate public access to the invention. The fairness considerations that underlie the constitutional protections against *ex post facto* laws and laws impairing the obligation of contracts would presumably disable Congress from making such a retroactive change in the public's bargain with an inventor without providing compensation for the taking. Those same considerations should protect members of the public who make plans to exploit an invention as soon as it enters the public domain from a retroactive modification of the bargain that extends the term of the patent monopoly. As I discuss below, the few historical exceptions to this rule do not undermine the constitutional analysis. For quite plainly, the limitations "implicit in the Patent Clause itself," 489 U. S., at 151, adequately explain why neither a State nor Congress may "extend the life of a patent beyond its expiration date," *Sears, Roebuck & Co.*, 376 U. S., at 231.[3]

Neither the purpose of encouraging new inventions nor the overriding interest in advancing progress by adding knowledge to the public domain is served by retroactively increasing the inventor's compensation for a completed invention and frustrating the legitimate expectations of members of the public who want to make use of it in a free

---

[3] The Court acknowledges that this proposition is "uncontroversial" today, see *ante*, at 202, n. 8, but overlooks the fact that it was highly controversial in the early 1800's. See n. 11, *infra*. The Court assumes that the *Sears* holding rested entirely on the pre-emptive effect of congressional statutes even though the opinion itself, like the opinions in *Graham* v. *John Deere Co. of Kansas City*, 383 U. S. 1 (1966), and *Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*, 489 U. S. 141 (1989), also relied on the pre-emptive effect of the constitutional provision. That at least some of the Framers recognized that the Constitution itself imposed a limitation even before Congress acted is demonstrated by Madison's letter, quoted in n. 6, *infra*.

market. Because those twin purposes provide the only avenue for congressional action under the Copyright/Patent Clause of the Constitution, any other action is manifestly unconstitutional.

## II

We have recognized that these twin purposes of encouraging new works and adding to the public domain apply to copyrights as well as patents. Thus, with regard to copyrights on motion pictures, we have clearly identified the overriding interest in the "release to the public of the products of [the author's] creative genius." *United States* v. *Paramount Pictures, Inc.,* 334 U. S. 131, 158 (1948).[4] And, as with patents, we have emphasized that the overriding purpose of providing a reward for authors' creative activity is to motivate that activity and "to allow the public access to the products of their genius after the limited period of exclusive control has expired." *Sony Corp. of America* v. *Universal City Studios, Inc.,* 464 U. S. 417, 429 (1984). *Ex post facto* extensions of copyrights result in a gratuitous transfer of wealth from the public to authors, publishers, and their successors in interest. Such retroactive extensions do not even arguably serve either of the purposes of the Copyright/Patent Clause. The reasons why such extensions of the patent monopoly are unconstitutional apply to copyrights as well.

Respondent, however, advances four arguments in support of the constitutionality of such retroactive extensions: (1) The first Copyright Act enacted shortly after the Consti-

---

[4] "The copyright law, like the patent statutes, makes reward to the owner a secondary consideration. In *Fox Film Corp.* v. *Doyal,* 286 U. S. 123, 127, Chief Justice Hughes spoke as follows respecting the copyright monopoly granted by Congress, 'The sole interest of the United States and the primary object in conferring the monopoly lie in the general benefits derived by the public from the labors of authors.' It is said that reward to the author or artist serves to induce release to the public of the products of his creative genius." 334 U. S., at 158.

tution was ratified applied to works that had already been produced; (2) later Congresses have repeatedly authorized extensions of copyrights and patents; (3) such extensions promote the useful arts by giving copyright holders an incentive to preserve and restore certain valuable motion pictures; and (4) as a matter of equity, whenever Congress provides a longer term as an incentive to the creation of new works by authors, it should provide an equivalent reward to the owners of all unexpired copyrights. None of these arguments is persuasive.

### III

Congress first enacted legislation under the Copyright/Patent Clause in 1790 when it passed bills creating federal patent and copyright protection. Because the content of that first legislation, the debate that accompanied it, and the differences between the initial versions and the bills that ultimately passed provide strong evidence of early Congresses' understanding of the constitutional limits of the Copyright/Patent Clause, I examine both the initial copyright and patent statutes.

Congress first considered intellectual property statutes in its inaugural session in 1789. The bill debated, House Resolution 10—"a bill to promote the progress of science and useful arts, by securing to authors and inventors the exclusive right to their respective writings and discoveries," 3 Documentary History of First Federal Congress of the United States 94 (L. de Pauw, C. Bickford, & L. Hauptman eds. 1977) (hereinafter Documentary History)—provided both copyright and patent protection for similar terms.[5] The first Congress did not pass H. R. 10, though a similar version was

---

[5] A copy of this bill specifically identified has not been found, though strong support exists for considering a bill from that session as H. R. 10. See E. Walterscheid, To Promote the Progress of Useful Arts: American Patent Law and Administration, 1798–1836, pp. 87–88 (1998) (hereinafter Walterscheid). This bill is reprinted in 4 Documentary History 513–519.

reintroduced in the second Congress in 1790. After minimal debate, however, the House of Representatives began consideration of two separate bills, one covering patents and the other copyrights. Because, as the majority recognizes, "congressional practice with respect to patents informs our inquiry," *ante*, at 201, I consider the history of both patent and copyright legislation.

## The Patent Act

What eventually became the Patent Act of 1790 had its genesis in House Resolution 41, introduced on February 16, 1790. That resolution differed from H. R. 10 in one important respect. Whereas H. R. 10 would have extended patent protection to only those inventions that were "not before known or used," H. R. 41, by contrast, added the phrase "within the United States" to that limitation and expressly authorized patent protection for "any person, who shall after the passing of this act, first import into the United States . . . any . . . device . . . not before used or known in the said States." 6 Documentary History 1626–1632. This change would have authorized patents of importation, providing United States patent protection for inventions already in use elsewhere. This change, however, was short lived and was removed by a floor amendment on March 5, 1789. Walterscheid 125. Though exact records of the floor debate are lost, correspondence from House Members indicate that doubts about the constitutionality of such a provision led to its removal. Representative Thomas Fitzsimmons wrote to a leading industrialist that day stating that the section "'allowing to Importers, was left out, the Constitutional power being Questionable.'" *Id.*, at 126 (quoting Letter from Rep. Thomas Fitzsimmons to Tench Coxe (Mar. 5, 1790)). James Madison himself recognized this constitutional limitation on patents of importation, flatly stating that the constitution "forbids patents for that purpose." 13 Pa-

pers of James Madison 128 (C. Hobson & R. Rutland eds. 1981) (reprinting letter to Tench Coxe (Mar. 28, 1790)).[6]

The final version of the 1790 Patent Act, 1 Stat. 109, did not contain the geographic qualifier and thus did not provide for patents of importation. This statutory omission, coupled with the contemporaneous statements by legislators, provides strong evidence that Congress recognized significant limitations on their constitutional authority under the Copyright/Patent Clause to extend protection to a class of intellectual properties. This recognition of a categorical constitutional limitation is fundamentally at odds with the majority's reading of Article I, §8, to provide essentially no limit on congressional action under the Clause. If early congressional practice does, indeed, inform our analysis, as it should, then the majority's judicial excision of these constitutional limits cannot be correct.

*The Copyright Act*

Congress also passed the first Copyright Act, 1 Stat. 124, in 1790. At that time there were a number of maps, charts, and books that had already been printed, some of which were copyrighted under state laws and some of which were arguably entitled to perpetual protection under the common law. The federal statute applied to those works as well as to new works. In some cases the application of the new federal rule reduced the pre-existing protections, and in others it

---

[6] "Your idea of appropriating a district of territory to the encouragement of imported inventions is new and worthy of consideration. I can not but apprehend however that the clause in the constitution which forbids patents for that purpose will lie equally in the way of your expedient. Congress seem to be tied down to the single mode of encouraging inventions by granting the exclusive benefit of them for a limited time, and therefore to have no more power to give a further encouragement out of a fund of land than a fund of money. This fetter on the National Legislature tho' an unfortunate one, was a deliberate one. The Latitude of authority now wished for was strongly urged and expressly rejected." Madison's description of the Copyright/Patent Clause as a "fetter on the National Legislature" is fully consistent with this Court's opinion in *Graham*.

may have increased the protection.[7]   What is significant is that the statute provided a general rule creating new federal rights that supplanted the diverse state rights that previously existed.   It did not extend or attach to any of those pre-existing state and common-law rights: "That congress, in passing the act of 1790, did not legislate in reference to existing rights, appears clear."   *Wheaton* v. *Peters*, 8 Pet. 591, 661 (1834); see also *Fox Film Corp.* v. *Doyal*, 286 U. S. 123, 127 (1932) ("As this Court has repeatedly said, the Congress did not sanction an existing right but created a new one"). Congress set in place a federal structure governing certain types of intellectual property for the new Republic.   That Congress exercised its unquestionable constitutional authority to *create* a new federal system securing rights for authors and inventors in 1790 does not provide support for the proposition that Congress can *extend pre-existing* federal protections retroactively.

Respondent places great weight on this first congressional action, arguing that it proves that "Congress thus unquestionably understood that it had authority to apply a new, more favorable copyright term to existing works."   Brief for Respondent 12–13.   That understanding, however, is not relevant to the question presented by this case—whether "Congress has the power under the Copyright Clause to extend retroactively the term of existing copyrights?"   Brief for

---

[7] Importantly, even this first Act required a *quid pro quo* in order to receive federal copyright protection.   In order to receive protection under the Act, the author was first required to register the work: "That no person shall be entitled to the benefit of this act, in cases where any map, chart, book or books, hath or have been already printed and published, unless he shall first deposit, and in all other cases, unless he shall before publication deposit a printed copy of the title of such map, chart, book or books, in the clerk's office of the district court where the author or proprietor shall reside." §3, 1 Stat. 124.   This registration requirement in federal district court—a requirement obviously not required under the various state laws protecting written works—further illustrates that the 1790 Act created new rights, rather than extending existing rights.

Petitioners i.[8]   Precisely put, the question presented by this case does not even implicate the 1790 Act, for that Act created, rather than extended, copyright protection.   That this law applied to works already in existence says nothing about the First Congress' conception of its power to extend this newly created federal right.

Moreover, Members of Congress in 1790 were well aware of the distinction between the creation of new copyright regimes and the extension of existing copyrights.   The 1790 Act was patterned, in many ways, after the Statute of Anne enacted in England in 1710.   8 Ann., c. 19; see *Fred Fisher Music Co.* v. *M. Witmark & Sons,* 318 U. S. 643, 647–648 (1943).   The English statute, in addition to providing authors with copyrights on new works for a term of 14 years renewable for another 14-year term, also replaced the booksellers' claimed perpetual rights in existing works with a single 21-year term.   In 1735, the booksellers proposed an amendment that would have extended the terms of existing copyrights until 1756, but the amendment was defeated. Opponents of the amendment had argued that if the bill were to pass, it would "in Effect be establishing a perpetual Monopoly . . . only to increase the private Gain of the

---

[8] Respondent's reformulation of the questions presented by this case confuses this basic distinction.   We granted certiorari to consider the question: "Did the D. C. Circuit err in holding that Congress has the power under the Copyright Clause to extend retroactively the term of existing copyrights?"   Respondent's reformulation of the first question presented—"Whether the 20-year extension of the terms of all unexpired copyrights . . . violates the Copyright Clause of the Constitution insofar as it applies to works in existence when it took effect"—significantly changes the substance of inquiry by changing the focus from the federal statute at issue to irrelevant common-law protections.   Brief for Respondent I.   Indeed, this reformulation violated this Court's Rule 24(1)(a), which states that "the brief [on the merits] may not raise additional questions or change the substance of the questions already presented in" the petition for certiorari.

Booksellers . . . ." [9]   The authors of the federal statute that used the Statute of Anne as a model were familiar with this history.   Accordingly, this Court should be especially wary of relying on Congress' creation of a new system to support the proposition that Congress unquestionably understood that it had constitutional authority to extend existing copyrights.

## IV

Since the creation of federal patent and copyright protection in 1790, Congress has passed a variety of legislation, both providing specific relief for individual authors and inventors as well as changing the general statutes conferring patent and copyright privileges.   Some of the changes did indeed, as the majority describes, extend existing protections retroactively.   Other changes, however, did not do so. A more complete and comprehensive look at the history of congressional action under the Copyright/Patent Clause demonstrates that history, in this case, does not provide the " 'volume of logic,' " *ante,* at 200, necessary to sustain the Sonny Bono Act's constitutionality.

Congress, aside from changing the process of applying for a patent in the 1793 Patent Act, did not significantly alter the basic patent and copyright systems for the next 40 years. During this time, however, Congress did consider many private bills.   Respondent seeks support from "Congress's historical practice of using its Copyright and Patent Clause authority to extend the terms of individual patents and copyrights."   Brief for Respondent 13.   Carefully read,

---

[9] "*A* LETTER *to a* MEMBER *of Parliament concerning the Bill now depending . . . for making more effectual an Act in the 8th Year of the Reign of Queen Anne, entituled,* An Act for the Encouragement of Learning, by . . . Vesting the Copies of Printed Books in the Authors or Purchasers."   Document reproduced in Goldsmiths'—Kress Library of Economic Literature, Segment I: Printed Books Through 1800, Microfilm No. 7300 (reel 460).

however, these private bills do not support respondent's historical gloss, but rather significantly undermine the historical claim.

The first example relied upon by respondent, the extension of Oliver Evans' patent in 1808, ch. 13, 6 Stat. 70, demonstrates the pitfalls of relying on an incomplete historical analysis. Evans, an inventor who had developed several improvements in milling flour, received the third federal patent on January 7, 1791. See Federico, Patent Trials of Oliver Evans, 27 J. Pat. Off. Soc. 586, 590 (1945). Under the 14-year term provided by the 1790 Patent Act, this patent was to expire on January 7, 1805. Claiming that 14 years had not provided him a sufficient time to realize income from his invention and that the net profits were spent developing improvements on the steam engine, Evans first sought an extension of his patent in December 1804. *Id.*, at 598; 14 Annals of Cong. 1002 (1805). Unsuccessful in 1804, he tried again in 1805, and yet again in 1806, to persuade Congress to pass his private bill. Undaunted, Evans tried one last time to revive his expired patent after receiving an adverse judgment in an infringement action. See *Evans* v. *Chambers*, 8 F. Cas. 837 (No. 4,555) (CC Pa. 1807). This time, his effort at private legislation was successful, and Congress passed a bill extending his patent for 14 years. See An Act for the relief of Oliver Evans, 6 Stat. 70. This legislation, passed January 21, 1808, restored a patent monopoly for an invention that had been in the public domain for over four years. As such, this Act unquestionably exceeded Congress' authority under the Copyright/Patent Clause: "The Congress in the exercise of the patent power may not overreach the restraints imposed by the stated constitutional purpose. . . . *Congress may not authorize the issuance of patents whose effects are to remove existent knowledge from the public domain, or to restrict free access to materials already available.*" *Graham*, 383 U. S., at 5–6 (emphasis added).

This extension of patent protection to an expired patent was not an isolated incident. Congress passed private bills either directly extending patents or allowing otherwise untimely applicants to apply for patent extensions for approximately 75 patents between 1790 and 1875. Of these 75 patents, at least 56 had already fallen into the public domain.[10] The fact that this repeated practice was patently unconstitutional completely undermines the majority's reliance on this history as "significant." *Ante,* at 201.

Copyright legislation has a similar history. The federal Copyright Act was first amended in 1831. That amendment, like later amendments, not only authorized a longer term for new works, but also extended the terms of unexpired copyrights. Respondent argues that that historical practice effectively establishes the constitutionality of retroactive extensions of unexpired copyrights. Of course, the practice buttressess the presumption of validity that attaches to every Act of Congress. But, as our decision in *INS* v. *Chadha,* 462 U. S. 919 (1983), demonstrates, the fact that Congress has repeatedly acted on a mistaken interpretation of the Constitution does not qualify our duty to invalidate an unconstitutional practice when it is finally challenged in an appropriate case. As Justice White pointed out in his dissent in *Chadha,* that case sounded the "death knell for nearly 200 other statutory provisions" in which Congress had exercised a "'legislative veto.'" *Id.,* at 967. Regardless of the effect of unconstitutional enactments of Congress, the scope of "'the constitutional power of Congress . . . is ultimately a

---

[10] See, *e. g.,* ch. 74, 6 Stat. 458 (patent had expired for three months); ch. 113, 6 Stat. 467 (patent had expired for over two years); ch. 213, 6 Stat. 589 (patent had expired for five months); ch. 158, 9 Stat. 734 (patent had expired for over two years); ch. 72, 14 Stat. 621 (patent had expired nearly four years); ch. 175, 15 Stat. 461 (patent had expired for over two years); ch. 15, 16 Stat. 613 (patent had expired for six years); ch. 317, 16 Stat. 659 (patent had expired for nearly four years); ch. 439, 17 Stat. 689 (patent had expired for over two years).

judicial rather than a legislative question, and can be settled finally only by this Court.'" *United States* v. *Morrison,* 529 U. S. 598, 614 (2000) (quoting *Heart of Atlanta Motel, Inc.* v. *United States,* 379 U. S. 241, 273 (1964) (Black, J., concurring)). For, as this Court has long recognized, "[i]t is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence." *Walz* v. *Tax Comm'n of City of New York,* 397 U. S. 664, 678 (1970).

It would be particularly unwise to attach constitutional significance to the 1831 amendment because of the very different legal landscape against which it was enacted. Congress based its authority to pass the amendment on grounds shortly thereafter declared improper by the Court. The Judiciary Committee Report prepared for the House of Representatives asserted that "an author has an exclusive and perpetual right, in preference to any other, to the fruits of his labor." 7 Cong. Deb., App., p. cxx (1831). The floor debate echoed this same sentiment. See, *e. g., id.,* at 424 (statement of Mr. Verplanck (rejecting the idea that copyright involved "an implied contract existing between an author and the public" for "[t]here was no contract; the work of an author was the result of his own labor" and copyright was "merely a legal provision for the protection of a natural right")). This sweat-of-the-brow view of copyright, however, was emphatically rejected by this Court in 1834 in *Wheaton* v. *Peters,* 8 Pet., at 661 ("Congress, then, by this act, instead of sanctioning an existing right, as contended for, created it"). No presumption of validity should attach to a statutory enactment that relied on a shortly thereafter discredited interpretation of the basis for congressional power.[11]

---

[11] In the period before our decision in *Wheaton,* the pre-emptive effect of the Patent/Copyright Clause was also a matter of serious debate within the legal profession. Indeed, in their argument in this Court in *Gibbons* v. *Ogden,* 9 Wheat., at 44–61, 141–157, the defenders of New York's grant of a 30-year monopoly on the passenger trade between New Jersey and

In 1861, Congress amended the term of patents, from a 14-year term plus opportunity for 7-year extension to a flat 17 years with no extension permitted. Act of Mar. 2, 1861, ch. 88, § 16, 12 Stat. 249. This change was not retroactive, but rather only applied to "all patents hereafter granted." *Ibid.* To be sure, Congress, at many times in its history, has retroactively extended the terms of existing copyrights and patents. This history, however, reveals a much more heterogeneous practice than respondent contends. It is replete with actions that were unquestionably unconstitutional. Though relevant, the history is not dispositive of the constitutionality of the Sonny Bono Act.

The general presumption that historic practice illuminates the constitutionality of congressional action is not controlling in this case. That presumption is strongest when the earliest acts of Congress are considered, for the overlap of identity between those who created the Constitution and those who first constituted Congress provides "contemporaneous and weighty evidence" of the Constitution's "true meaning." *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265, 297 (1888). But that strong presumption does not attach to congressional action in 1831, because no member of the 1831 Congress had been a delegate to the framing convention 44 years earlier.

Moreover, judicial opinions relied upon by the majority interpreting early legislative enactments have either been implicitly overruled or do not support the proposition claimed. *Graham* flatly contradicts the cases relied on by the majority and respondent for support that "renewed or extended terms

Manhattan argued that the Clause actually should be interpreted as confirming the State's authority to grant monopoly privileges that supplemented any federal grant. That argument is, of course, flatly inconsistent with our recent unanimous decision in *Bonito Boats, Inc.* v. *Thunder Craft Boats, Inc.*, 489 U. S. 141 (1989). Although Attorney General Wirt had urged the Court to endorse our present interpretation of the Clause, its implicit limitations were unsettled when the 1831 Copyright Act was passed.

were upheld in the early days." *Ante,* at 202.[12] *Evans* v. *Jordan,* 8 F. Cas. 872, 874 (No. 4,564) (CC Va. 1813) (Marshall, J.); *Evans* v. *Robinson,* 8 F. Cas. 886, 888 (No. 4,571) (CC Md. 1813); and *Blanchard* v. *Sprague,* 3 F. Cas. 648, 650 (No. 1,518) (CC Mass. 1839) (Story, J.), all held that private bills passed by Congress extending previously expired patents were valid. *Evans* v. *Jordan* and *Evans* v. *Robinson* both considered Oliver Evans' private bill discussed above while *Blanchard* involved ch. 213, 6 Stat. 589, which extended Thomas Blanchard's patent after it had been in the public domain for five months. Irrespective of what circuit courts held "in the early days," *ante,* at 202, such holdings have been implicitly overruled by *Graham* and, therefore, provide no support for respondent in the present constitutional inquiry.

The majority's reliance on the other patent case it cites is similarly misplaced. Contrary to the suggestion in the Court's opinion, *McClurg* v. *Kingsland,* 1 How. 202 (1843), did not involve the "legislative expansion" of an existing patent. *Ante,* at 202. The question in that case was whether the former employer of the inventor, one James Harley, could be held liable as an infringer for continuing to use the process that Harley had invented in 1834 when he was in its employ. The Court first held that the employer's use of the process before the patent issued was not a public

---

[12] It is true, as the majority points out, *ante,* at 202, n. 7, that *Graham* did not expressly overrule those earlier cases because *Graham* did not address the issue whether Congress could revive expired patents. That observation does not even arguably justify reliance on a set of old circuit court cases to support a proposition that is inconsistent with our present understanding of the limits imposed by the Copyright/Patent Clause. After all, a unanimous Court recently endorsed the precise analysis that the majority now seeks to characterize as "wishful thinking." *Ante,* at 202, n. 7. See *Bonito Boats,* 489 U. S., at 146 ("Congress may not create patent monopolies of unlimited duration, nor may it 'authorize the issuance of patents whose effects are to remove existent knowledge from the public domain, or to restrict free access to materials already available'" (quoting *Graham,* 383 U. S., at 6)).

use that would invalidate the patent, even if it might have had that effect prior to the amendment of the patent statute in 1836. 1 How., at 206–208. The Court then disposed of the case on the ground that a statute enacted in 1839 protected the alleged infringer's right to continue to use the process after the patent issued. *Id.*, at 209–211. Our opinion said nothing about the power of Congress to extend the life of an issued patent. It did note that Congress has plenary power to legislate on the subject of patents provided "that they do not take away the rights of property in existing patents." *Id.*, at 206. The fact that Congress cannot change the bargain between the public and the patentee in a way that disadvantages the patentee is, of course, fully consistent with the view that it cannot enlarge the patent monopoly to the detriment of the public after a patent has issued.

The history of retroactive extensions of existing and expired copyrights and patents, though relevant, is not conclusive of the constitutionality of the Sonny Bono Act. The fact that the Court has not previously passed upon the constitutionality of retroactive copyright extensions does not insulate the present extension from constitutional challenge.

## V

Respondent also argues that the Act promotes the useful arts by providing incentives to restore old movies. For at least three reasons, the interest in preserving perishable copies of old copyrighted films does not justify a wholesale extension of existing copyrights. First, such restoration and preservation will not even arguably promote any new works by authors or inventors. And, of course, any original expression in the restoration and preservation of movies will receive new copyright protection.[13] Second, however strong

---

[13] Indeed, the Lodging of the Motion Picture Association of America, Inc., as *Amicus Curiae* illustrates the significant creative work involved in releasing these classics. The Casablanca Digital Video Disc (DVD) con-

the justification for preserving such works may be, that justification applies equally to works whose copyrights have already expired. Yet no one seriously contends that the Copyright/Patent Clause would authorize the grant of monopoly privileges for works already in the public domain solely to encourage their restoration. Finally, even if this concern with aging movies would permit congressional protection, the remedy offered—a blanket extension of all copyrights—simply bears no relationship to the alleged harm.

## VI

Finally, respondent relies on concerns of equity to justify the retroactive extension. If Congress concludes that a longer period of exclusivity is necessary in order to provide an adequate incentive to authors to produce new works, respondent seems to believe that simple fairness requires that the same lengthened period be provided to authors whose works have already been completed and copyrighted. This is a classic non sequitur. The reason for increasing the inducement to create something new simply does not apply to an already-created work. To the contrary, the equity argument actually provides strong support for petitioners. Members of the public were entitled to rely on a promised access to copyrighted or patented works at the expiration of the terms specified when the exclusive privileges were granted. On the other hand, authors will receive the full benefit of the exclusive terms that were promised as an inducement to their creativity, and have no equitable claim to increased compensation for doing nothing more.

tains a "documentary *You Must Remember This,* hosted by Lauren Bacall and featuring recently unearthed outtakes" and an "[a]ll-new introduction by Lauren Bacall." Disc cover text. Similarly, the Citizen Kane DVD includes "[t]wo feature-length audio commentaries: one by film critic Roger Ebert and the other by director/Welles biographer Peter Bogdanovich" and a "gallery of storyboards, rare photos, alternate ad campaigns, studio correspondence, call sheets and other memorabilia" in addition to a 2-hour documentary. Disc cover text.

One must indulge in two untenable assumptions to find support in the equitable argument offered by respondent— that the public interest in free access to copyrighted works is entirely worthless and that authors, as a class, should receive a windfall solely based on completed creative activity. Indeed, Congress has apparently indulged in those assumptions for under the series of extensions to copyrights, with the exception of works which required renewal and which were not renewed, no copyrighted work created in the past 80 years has entered the public domain or will do so until 2019. But as our cases repeatedly and consistently emphasize, ultimate public access is the overriding purpose of the constitutional provision. See, e. g., *Sony Corp.*, 464 U. S., at 429. *Ex post facto* extensions of existing copyrights, unsupported by any consideration of the public interest, frustrate the central purpose of the Clause.

## VII

The express grant of a perpetual copyright would unquestionably violate the textual requirement that the authors' exclusive rights be only "for limited Times." Whether the extraordinary length of the grants authorized by the 1998 Act are invalid because they are the functional equivalent of perpetual copyrights is a question that need not be answered in this case because the question presented by the certiorari petition merely challenges Congress' power to extend retroactively the terms of existing copyrights. Accordingly, there is no need to determine whether the deference that is normally given to congressional policy judgments may save from judicial review its decision respecting the appropriate length of the term.[14] It is important to note, however, that

---

[14] Similarly, the validity of earlier retroactive extensions of copyright protection is not at issue in this case. To decide the question now presented, we need not consider whether the reliance and expectation interests that have been established by prior extensions passed years ago would alter the result. Cf. *Heckler* v. *Mathews*, 465 U. S. 728, 746 (1984)

a categorical rule prohibiting retroactive extensions would effectively preclude perpetual copyrights. More importantly, as the House of Lords recognized when it refused to amend the Statute of Anne in 1735, unless the Clause is construed to embody such a categorical rule, Congress may extend existing monopoly privileges *ad infinitum* under the majority's analysis.

By failing to protect the public interest in free access to the products of inventive and artistic genius—indeed, by virtually ignoring the central purpose of the Copyright/Patent Clause—the Court has quitclaimed to Congress its principal responsibility in this area of the law. Fairly read, the Court has stated that Congress' actions under the Copyright/Patent Clause are, for all intents and purposes, judicially unreviewable. That result cannot be squared with the basic tenets of our constitutional structure. It is not hyperbole to recall the trenchant words of Chief Justice John Marshall: "It is emphatically the province and duty of the judicial department to say what the law is." *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803). We should discharge that responsibility as we did in *Chadha.*

I respectfully dissent.

JUSTICE BREYER, dissenting.

The Constitution's Copyright Clause grants Congress the power to *"promote* the *Progress* of Science . . . by securing for *limited* Times to *Authors* . . . the exclusive Right to their respective Writings." Art. I, §8, cl. 8 (emphasis added). The statute before us, the 1998 Sonny Bono Copyright Term Extension Act, extends the term of most existing copyrights

---

("We have recognized, in a number of contexts, the legitimacy of protecting reasonable reliance on prior law even when that requires allowing an unconstitutional statute to remain in effect for a limited period of time"). Those interests are not at issue now, because the act under review in this case was passed only four years ago and has been under challenge in court since shortly after its enactment.

to 95 years and that of many new copyrights to 70 years after the author's death. The economic effect of this 20-year extension—the longest blanket extension since the Nation's founding—is to make the copyright term not limited, but virtually perpetual. Its primary legal effect is to grant the extended term not to authors, but to their heirs, estates, or corporate successors. And most importantly, its practical effect is not to promote, but to inhibit, the progress of "Science"—by which word the Framers meant learning or knowledge, E. Walterscheid, The Nature of the Intellectual Property Clause: A Study in Historical Perspective 125–126 (2002).

The majority believes these conclusions rest upon practical judgments that at most suggest the statute is unwise, not that it is unconstitutional. Legal distinctions, however, are often matters of degree. *Panhandle Oil Co.* v. *Mississippi ex rel. Knox*, 277 U. S. 218, 223 (1928) (Holmes, J., dissenting), overruled in part by *Alabama* v. *King & Boozer*, 314 U. S. 1, 8–9 (1941); accord, *Walz* v. *Tax Comm'n of City of New York*, 397 U. S. 664, 678–679 (1970). And in this case the failings of degree are so serious that they amount to failings of constitutional kind. Although the Copyright Clause grants broad legislative power to Congress, that grant has limits. And in my view this statute falls outside them.

I

The "monopoly privileges" that the Copyright Clause confers "are neither unlimited nor primarily designed to provide a special private benefit." *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S. 417, 429 (1984); cf. *Graham* v. *John Deere Co. of Kansas City*, 383 U. S. 1, 5 (1966). This Court has made clear that the Clause's limitations are judicially enforceable. *E. g., Trade-Mark Cases*, 100 U. S. 82, 93–94 (1879). And, in assessing this statute for that purpose, I would take into account the fact that the Constitution is a single document, that it contains both a

Copyright Clause and a First Amendment, and that the two are related.

The Copyright Clause and the First Amendment seek related objectives—the creation and dissemination of information. When working in tandem, these provisions mutually reinforce each other, the first serving as an "engine of free expression," *Harper & Row, Publishers, Inc.* v. *Nation Enterprises,* 471 U. S. 539, 558 (1985), the second assuring that government throws up no obstacle to its dissemination. At the same time, a particular statute that exceeds proper Copyright Clause bounds may set Clause and Amendment at cross-purposes, thereby depriving the public of the speech-related benefits that the Founders, through both, have promised.

Consequently, I would review plausible claims that a copyright statute seriously, and unjustifiably, restricts the dissemination of speech somewhat more carefully than reference to this Court's traditional Copyright Clause jurisprudence might suggest, cf. *ante,* at 204–205, and n. 10. There is no need in this case to characterize that review as a search for " 'congruence and proportionality,' " *ante,* at 218, or as some other variation of what this Court has called "intermediate scrutiny," *e. g., San Francisco Arts & Athletics, Inc.* v. *United States Olympic Comm.,* 483 U. S. 522, 536–537 (1987) (applying intermediate scrutiny to a variant of normal trademark protection). Cf. *Nixon* v. *Shrink Missouri Government PAC,* 528 U. S. 377, 402–403 (2000) (BREYER, J., concurring) (test of proportionality between burdens and benefits "where a law significantly implicates competing constitutionally protected interests"). Rather, it is necessary only to recognize that this statute involves not pure economic regulation, but regulation of expression, and what may count as rational where economic regulation is at issue is not necessarily rational where we focus on expression—in a Nation constitutionally dedicated to the free dissemination of speech, information, learning, and culture. In this sense

only, and where line-drawing among constitutional interests is at issue, I would look harder than does the majority at the statute's rationality—though less hard than precedent might justify, see, *e. g., Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432, 446–450 (1985); *Plyler* v. *Doe*, 457 U. S. 202, 223–224 (1982); *Department of Agriculture* v. *Moreno*, 413 U. S. 528, 534–538 (1973).

Thus, I would find that the statute lacks the constitutionally necessary rational support (1) if the significant benefits that it bestows are private, not public; (2) if it threatens seriously to undermine the expressive values that the Copyright Clause embodies; and (3) if it cannot find justification in any significant Clause-related objective. Where, after examination of the statute, it becomes difficult, if not impossible, even to dispute these characterizations, Congress' "choice is clearly wrong." *Helvering* v. *Davis*, 301 U. S. 619, 640 (1937).

## II

### A

Because we must examine the relevant statutory effects in light of the Copyright Clause's own purposes, we should begin by reviewing the basic objectives of that Clause. The Clause authorizes a "tax on readers for the purpose of giving a bounty to writers." 56 Parl. Deb. (3d Ser.) (1841) 341, 350 (Lord Macaulay). Why? What constitutional purposes does the "bounty" serve?

The Constitution itself describes the basic Clause objective as one of "promot[ing] the Progress of Science," *i. e.*, knowledge and learning. The Clause exists not to "provide a special private benefit," *Sony, supra*, at 429, but "to stimulate artistic creativity for the general public good," *Twentieth Century Music Corp.* v. *Aiken*, 422 U. S. 151, 156 (1975). It does so by "motivat[ing] the creative activity of authors" through "the provision of a special reward." *Sony, supra*, at 429. The "reward" is a means, not an end. And that is

why the copyright term is limited. It is limited so that its beneficiaries—the public—"will not be permanently deprived of the fruits of an artist's labors." *Stewart* v. *Abend,* 495 U. S. 207, 228 (1990).

That is how the Court previously has described the Clause's objectives. See also *Mazer* v. *Stein,* 347 U. S. 201, 219 (1954) ("[C]opyright law . . . makes reward to the owner a secondary consideration" (internal quotation marks omitted)); *Sony,* 464 U. S., at 429 ("[L]imited grant" is "intended . . . to allow the public access to the products of [authors'] genius after the limited period of exclusive control has expired"); *Harper & Row, supra,* at 545 (Copyright is "intended to increase and not to impede the harvest of knowledge"). But cf. *ante,* at 212, n. 18. And, in doing so, the Court simply has reiterated the views of the Founders.

Madison, like Jefferson and others in the founding generation, warned against the dangers of monopolies. See, *e. g.,* Monopolies. Perpetuities. Corporations. Ecclesiastical Endowments. in J. Madison, Writings 756 (J. Rakove ed. 1999) (hereinafter Madison on Monopolies); Letter from Thomas Jefferson to James Madison (July 31, 1788), in 13 Papers of Thomas Jefferson 443 (J. Boyd ed. 1956) (hereinafter Papers of Thomas Jefferson) (arguing against even copyright monopolies); 2 Annals of Cong. 1917 (1791) (statement of Rep. Jackson in the First Congress, Feb. 1791) ("What was it drove our forefathers to this country? Was it not the ecclesiastical corporations and perpetual monopolies of England and Scotland?"). Madison noted that the Constitution had "limited them to two cases, the authors of Books, and of useful inventions." Madison on Monopolies 756. He thought that in those two cases monopoly is justified because it amounts to "compensation for" an actual community "benefit" and because the monopoly is "temporary"—the term originally being 14 years (once renewable). *Ibid.* Madison concluded that "under that limitation a sufficient recompence and encouragement may be given." *Ibid.* But

he warned in general that monopolies must be "guarded with strictness agst abuse." *Ibid.*

Many Members of the Legislative Branch have expressed themselves similarly. Those who wrote the House Report on the landmark Copyright Act of 1909, for example, said that copyright was not designed "primarily" to "benefit" the "author" or "any particular class of citizens, however worthy." H. R. Rep. No. 2222, 60th Cong., 2d Sess., 6–7 (1909). Rather, under the Constitution, copyright was designed "primarily for the benefit of the public," for "the benefit of the great body of people, in that it will stimulate writing and invention." *Id.*, at 7. And were a copyright statute not "believed, in fact, to accomplish" the basic constitutional objective of advancing learning, that statute "would be beyond the power of Congress" to enact. *Id.*, at 6–7. Similarly, those who wrote the House Report on legislation that implemented the Berne Convention for the Protection of Literary and Artistic Works said that "[t]he constitutional purpose of copyright is to facilitate the flow of ideas in the interest of learning." H. R. Rep. No. 100–609, p. 22 (1988) (internal quotation marks omitted). They added:

> "Under the U. S. Constitution, the primary objective of copyright law is not to reward the author, but rather to secure for the public the benefits derived from the authors' labors. By giving authors an incentive to create, the public benefits in two ways: when the original expression is created and . . . when the limited term . . . expires and the creation is added to the public domain." *Id.*, at 17.

For present purposes, then, we should take the following as well established: that copyright statutes must serve public, not private, ends; that they must seek "to promote the Progress" of knowledge and learning; and that they must do so both by creating incentives for authors to produce and by removing the related restrictions on dissemination after

expiration of a copyright's "limited Tim[e]"—a time that (like "a *limited* monarch") is "restrain[ed]" and "circumscribe[d]," "not [left] at large," 2 S. Johnson, A Dictionary of the English Language 1151 (4th rev. ed. 1773). I would examine the statute's effects in light of these well-established constitutional purposes.

B

This statute, like virtually every copyright statute, imposes upon the public certain expression-related costs in the form of (1) royalties that may be higher than necessary to evoke creation of the relevant work, and (2) a requirement that one seeking to reproduce a copyrighted work must obtain the copyright holder's permission. The first of these costs translates into higher prices that will potentially restrict a work's dissemination. The second means search costs that themselves may prevent reproduction even where the author has no objection. Although these costs are, in a sense, inevitable concomitants of copyright protection, there are special reasons for thinking them especially serious here.

First, the present statute primarily benefits the holders of existing copyrights, *i. e.,* copyrights on works already created. And a Congressional Research Service (CRS) study prepared for Congress indicates that the added royalty-related sum that the law will transfer to existing copyright holders is large. E. Rappaport, CRS Report for Congress, Copyright Term Extension: Estimating the Economic Values (1998) (hereinafter CRS Report). In conjunction with official figures on copyright renewals, the CRS Report indicates that only about 2% of copyrights between 55 and 75 years old retain commercial value—*i. e.,* still generate royalties after that time. Brief for Petitioners 7 (estimate, uncontested by respondent, based on data from the CRS, Census Bureau, and Library of Congress). But books, songs, and movies of that vintage still earn about $400 million per year in royalties. CRS Report 8, 12, 15. Hence, (despite declin-

ing consumer interest in any given work over time) one might conservatively estimate that 20 extra years of copyright protection will mean the transfer of several billion extra royalty dollars to holders of existing copyrights—copyrights that, together, already will have earned many billions of dollars in royalty "reward." See *id.,* at 16.

The extra royalty payments will not come from thin air. Rather, they ultimately come from those who wish to read or see or hear those classic books or films or recordings that have survived. Even the $500,000 that United Airlines has had to pay for the right to play George Gershwin's 1924 classic Rhapsody in Blue represents a cost of doing business, potentially reflected in the ticket prices of those who fly. See Ganzel, Copyright or Copywrong? 39 Training 36, 42 (Dec. 2002). Further, the likely amounts of extra royalty payments are large enough to suggest that unnecessarily high prices will unnecessarily restrict distribution of classic works (or lead to disobedience of the law)—not just in theory but in practice. Cf. CRS Report 3 ("[N]ew, cheaper editions can be expected when works come out of copyright"); Brief for College Art Association et al. as *Amici Curiae* 24 (One year after expiration of copyright on Willa Cather's My Antonia, seven new editions appeared at prices ranging from $2 to $24); Ganzel, *supra,* at 40–41, 44 (describing later abandoned plans to charge individual Girl Scout camps $257 to $1,439 annually for a license to sing songs such as God Bless America around a campfire).

A second, equally important, cause for concern arises out of the fact that copyright extension imposes a "permissions" requirement—not only upon potential users of "classic" works that still retain commercial value, but also upon potential users of *any other work* still in copyright. Again using CRS estimates, one can estimate that, by 2018, the number of such works 75 years of age or older will be about 350,000. See Brief for Petitioners 7. Because the Copyright Act of 1976 abolished the requirement that an owner must renew a

copyright, such still-in-copyright works (of little or no commercial value) will eventually number in the millions. See Pub. L. 94–553, §§ 302–304, 90 Stat. 2572–2576; U. S. Dept. of Commerce, Bureau of Census, Statistical History of the United States: From Colonial Times to the Present 956 (1976) (hereinafter Statistical History).

The potential users of such works include not only movie buffs and aging jazz fans, but also historians, scholars, teachers, writers, artists, database operators, and researchers of all kinds—those who want to make the past accessible for their own use or for that of others. The permissions requirement can inhibit their ability to accomplish that task. Indeed, in an age where computer-accessible databases promise to facilitate research and learning, the permissions requirement can stand as a significant obstacle to realization of that technological hope.

The reason is that the permissions requirement can inhibit or prevent the use of old works (particularly those without commercial value): (1) because it may prove expensive to track down or to contract with the copyright holder, (2) because the holder may prove impossible to find, or (3) because the holder when found may deny permission either outright or through misinformed efforts to bargain. The CRS, for example, has found that the cost of seeking permission "can be prohibitive." CRS Report 4. And *amici*, along with petitioners, provide examples of the kinds of significant harm at issue.

Thus, the American Association of Law Libraries points out that the clearance process associated with creating an electronic archive, Documenting the American South, "consumed approximately a dozen man-hours" *per work*. Brief for American Association of Law Libraries et al. as *Amici Curiae* 20. The College Art Association says that the costs of obtaining permission for use of single images, short excerpts, and other short works can become prohibitively high; it describes the abandonment of efforts to include, *e. g.,* cam-

paign songs, film excerpts, and documents exposing "horrors of the chain gang" in historical works or archives; and it points to examples in which copyright holders in effect have used their control of copyright to try to control the content of historical or cultural works. Brief for College Art Association et al. as *Amici Curiae* 7–13. The National Writers Union provides similar examples. Brief for National Writers Union et al. as *Amici Curiae* 25–27. Petitioners point to music fees that may prevent youth or community orchestras, or church choirs, from performing early 20th-century music. Brief for Petitioners 3–5; see also App. 16–17 (Copyright extension caused abandonment of plans to sell sheet music of Maurice Ravel's Alborada Del Gracioso). *Amici* for petitioners describe how electronic databases tend to avoid adding to their collections works whose copyright holders may prove difficult to contact, see, *e. g.*, Arms, Getting the Picture: Observations from the Library of Congress on Providing Online Access to Pictorial Images, 48 Library Trends 379, 405 (1999) (describing how this tendency applies to the Library of Congress' own digital archives).

As I have said, to some extent costs of this kind accompany any copyright law, regardless of the length of the copyright term. But to extend that term, preventing works from the 1920's and 1930's from falling into the public domain, will dramatically increase the size of the costs just as—perversely—the likely benefits from protection diminish. See *infra*, at 254–256. The older the work, the less likely it retains commercial value, and the harder it will likely prove to find the current copyright holder. The older the work, the more likely it will prove useful to the historian, artist, or teacher. The older the work, the less likely it is that a sense of authors' rights can justify a copyright holder's decision not to permit reproduction, for the more likely it is that the copyright holder making the decision is not the work's creator, but, say, a corporation or a great-grandchild whom the work's creator never knew. Similarly, the costs of obtaining

permission, now perhaps ranging in the millions of dollars, will multiply as the number of holders of affected copyrights increases from several hundred thousand to several million. See *supra*, at 249–250. The costs to the users of nonprofit databases, now numbering in the low millions, will multiply as the use of those computer-assisted databases becomes more prevalent. See, *e. g.*, Brief for Internet Archive et al. as *Amici Curiae* 2, 21, and n. 37 (describing nonprofit Project Gutenberg). And the qualitative costs to education, learning, and research will multiply as our children become ever more dependent for the content of their knowledge upon computer-accessible databases—thereby condemning that which is not so accessible, say, the cultural content of early 20th-century history, to a kind of intellectual purgatory from which it will not easily emerge.

The majority finds my description of these permissions-related harms overstated in light of Congress' inclusion of a statutory exemption, which, during the last 20 years of a copyright term, exempts "facsimile or digital" reproduction by a "library or archives" "for purposes of preservation, scholarship, or research," 17 U. S. C. § 108(h). *Ante*, at 220. This exemption, however, applies only where the copy is made for the special listed purposes; it simply permits a library (not any other subsequent users) to make "a copy" for those purposes; it covers only "published" works not "subject to normal commercial exploitation" and not obtainable, apparently not even as a used copy, at a "reasonable price"; and it insists that the library assure itself through "reasonable investigation" that these conditions have been met. § 108(h). What database proprietor can rely on so limited an exemption—particularly when the phrase "reasonable investigation" is so open-ended and particularly if the database has commercial, as well as noncommercial, aspects?

The majority also invokes the "fair use" exception, and it notes that copyright law itself is restricted to protection of a work's expression, not its substantive content. *Ante*, at

219–220. Neither the exception nor the restriction, however, would necessarily help those who wish to obtain from electronic databases material that is not there—say, teachers wishing their students to see albums of Depression Era photographs, to read the recorded words of those who actually lived under slavery, or to contrast, say, Gary Cooper's heroic portrayal of Sergeant York with filmed reality from the battlefield of Verdun. Such harm, and more, see *supra*, at 248–252, will occur despite the 1998 Act's exemptions and despite the other "First Amendment safeguards" in which the majority places its trust, *ante*, at 219–220.

I should add that the Motion Picture Association of America also finds my concerns overstated, at least with respect to films, because the extension will sometimes make it profitable to reissue old films, saving them from extinction. Brief for Motion Picture Association of America, Inc., as *Amicus Curiae* 14–24. Other film preservationists note, however, that only a small minority of the many films, particularly silent films, from the 1920's and 1930's have been preserved. 1 Report of the Librarian of Congress, Film Preservation 1993, pp. 3–4 (Half of all pre-1950 feature films and more than 80% of all such pre-1929 films have already been lost); cf. Brief for Hal Roach Studios et al. as *Amici Curiae* 18 (Out of 1,200 Twenties Era silent films still under copyright, 63 are now available on digital video disc). They seek to preserve the remainder. See, *e. g.*, Brief for Internet Archive et al. as *Amici Curiae* 22 (Nonprofit database digitized 1,001 public-domain films, releasing them online without charge); 1 Film Preservation 1993, *supra*, at 23 (reporting well over 200,000 titles held in public archives). And they tell us that copyright extension will impede preservation by forbidding the reproduction of films within their own or within other public collections. Brief for Hal Roach Studios et al. as *Amici Curiae* 10–21; see also Brief for Internet Archive et al. as *Amici Curiae* 16–29; Brief for American Association of Law Libraries et al. as *Amici Curiae* 26–27.

Because this subsection concerns only costs, not counter-vailing benefits, I shall simply note here that, with respect to films as with respect to other works, extension does cause substantial harm to efforts to preserve and to disseminate works that were created long ago. And I shall turn to the second half of the equation: Could Congress reasonably have found that the extension's toll-related and permissions-related harms are justified by extension's countervailing preservationist incentives or in other ways?

## C

What copyright-related benefits might justify the statute's extension of copyright protection? First, no one could reasonably conclude that copyright's traditional economic rationale applies here. The extension will not act as an economic spur encouraging authors to create new works. See *Mazer*, 347 U. S., at 219 (The "economic philosophy" of the Copyright Clause is to "advance public welfare" by "encourag[ing] individual effort" through "personal gain"); see also *ante*, at 212, n. 18 ("[C]opyright law serves public ends by providing individuals with an incentive to pursue private ones"). No potential author can reasonably believe that he has more than a tiny chance of writing a classic that will survive commercially long enough for the copyright extension to matter. After all, if, after 55 to 75 years, only 2% of all copyrights retain commercial value, the percentage surviving after 75 years or more (a typical pre-extension copyright term)—must be far smaller. See *supra*, at 248; CRS Report 7 (estimating that, even after copyright renewal, about 3.8% of copyrighted books go out of print each year). And any remaining monetary incentive is diminished dramatically by the fact that the relevant royalties will not arrive until 75 years or more into the future, when, not the author, but distant heirs, or shareholders in a successor corporation, will receive them. Using assumptions about the time value of money provided us by a group of economists (including five

Nobel prize winners), Brief for George A. Akerlof et al. as *Amici Curiae* 5–7, it seems fair to say that, for example, a 1% likelihood of earning $100 annually for 20 years, starting *75 years into the future*, is worth less than seven cents today. See *id.*, App. 3a; see also CRS Report 5. See generally Appendix, Part A, *infra.*

What potential Shakespeare, Wharton, or Hemingway would be moved by such a sum? What monetarily motivated Melville would not realize that he could do better for his grandchildren by putting a few dollars into an interest-bearing bank account? The Court itself finds no evidence to the contrary. It refers to testimony before Congress (1) that the copyright system's incentives encourage creation, and (2) (referring to Noah Webster) that income earned from one work can help support an artist who "'continue[s] to create.'" *Ante*, at 208, n. 15. But the first of these amounts to no more than a set of undeniably true propositions about the value of incentives *in general.* And the applicability of the second to *this* Act is mysterious. How will extension help today's Noah Webster create new works 50 years after his death? Or is that hypothetical Webster supposed to support himself with the extension's present discounted value, *i. e.*, a few pennies? Or (to change the metaphor) is the argument that Dumas *fils* would have written more books had Dumas *père*'s Three Musketeers earned more royalties?

Regardless, even if this cited testimony were meant more specifically to tell Congress that somehow, somewhere, some potential author might be moved by the thought of great-grandchildren receiving copyright royalties a century hence, so might some potential author also be moved by the thought of royalties being paid for two centuries, five centuries, 1,000 years, "'til the End of Time." And from a rational economic perspective the time difference among these periods *makes no real difference.* The present extension will produce a copyright period of protection that, even under conservative

assumptions, is worth more than *99.8%* of protection *in perpetuity* (more than *99.99%* for a songwriter like Irving Berlin and a song like Alexander's Ragtime Band). See Appendix, Part A, *infra.* The lack of a practically meaningful distinction from an author's *ex ante* perspective between (a) the statute's extended terms and (b) an infinite term makes this latest extension difficult to square with the Constitution's insistence on "limited Times." Cf. Tr. of Oral Arg. 34 (Solicitor General's related concession).

I am not certain why the Court considers it relevant in this respect that "[n]othing . . . warrants construction of the [1998 Act's] 20-year term extension as a congressional attempt to evade or override the 'limited Times' constraint." *Ante,* at 209. Of course Congress did not intend to act unconstitutionally. But it may have sought to test the Constitution's limits. After all, the statute was named after a Member of Congress, who, the legislative history records, "wanted the term of copyright protection to last forever." 144 Cong. Rec. H9952 (daily ed. Oct. 7, 1998) (statement of Rep. Mary Bono). See also Copyright Term, Film Labeling, and Film Preservation Legislation: Hearings on H. R. 989 et al. before the Subcommittee on Courts and Intellectual Property of the House Judiciary Committee, 104th Cong., 1st Sess., 94 (1995) (hereinafter House Hearings) (statement of Rep. Sonny Bono) (questioning why copyrights should ever expire); *ibid.* (statement of Rep. Berman) ("I guess we could . . . just make a permanent moratorium on the expiration of copyrights"); *id.,* at 230 (statement of Rep. Hoke) ("Why 70 years? Why not forever? Why not 150 years?"); cf. *ibid.* (statement of the Register of Copyrights) (In Copyright Office proceedings, "[t]he Songwriters Guild suggested a perpetual term"); *id.,* at 234 (statement of Quincy Jones) ("I'm particularly fascinated with Representative Hoke's statement. . . . [W]hy not forever?"); *id.,* at 277 (statement of Quincy Jones) ("If we can start with 70, add 20, it would be a good start"). And the statute ended up creating a term so long that (were the vest-

ing of 19th-century real property at issue) it would typically violate the traditional rule against perpetuities. See 10 R. Powell, Real Property §§ 71.02[2]–[3], p. 71–11 (M. Wolf ed. 2002) (traditional rule that estate must vest, if at all, within lives in being plus 21 years); cf. *id.*, § 71.03, at 71–15 (modern statutory perpetuity term of 90 years, 5 years shorter than 95-year copyright terms).

In any event, the incentive-related numbers are far too small for Congress to have concluded rationally, even with respect to new works, that the extension's economic-incentive effect could justify the serious expression-related harms earlier described. See Part II–B, *supra.* And, of course, in respect to works already created—the source of many of the harms previously described—*the statute creates no economic incentive at all.* See *ante,* at 226–227 (STE-VENS, J., dissenting).

Second, the Court relies heavily for justification upon international uniformity of terms. *Ante,* at 196, 205–206. Although it can be helpful to look to international norms and legal experience in understanding American law, cf. *Printz* v. *United States,* 521 U. S. 898, 977 (1997) (BREYER, J., dissenting), in this case the justification based upon foreign rules is surprisingly weak. Those who claim that significant copyright-related benefits flow from greater international uniformity of terms point to the fact that the nations of the European Union have adopted a system of copyright terms uniform among themselves. And the extension before this Court implements a term of life plus 70 years that appears to conform with the European standard. But how does "uniformity" help to justify this statute?

Despite appearances, the statute does *not* create a uniform American-European term with respect to the lion's share of the economically significant works that it affects—*all* works made "for hire" and *all* existing works created prior to 1978. See Appendix, Part B, *infra.* With respect to those works the American statute produces an extended term of 95 years

while comparable European rights in "for hire" works last for periods that vary from 50 years to 70 years to life plus 70 years. Compare 17 U. S. C. §§ 302(c), 304(a)–(b), with Council Directive 93/98/EEC of 29 October 1993 Harmonizing the Term of Protection of Copyright and Certain Related Rights, Arts. 1–3, 1993 Official J. Eur. Coms. (L 290), pp. 11–12 (hereinafter EU Council Directive 93/98). Neither does the statute create uniformity with respect to anonymous or pseudonymous works. Compare 17 U. S. C. §§ 302(c), 304(a)–(b), with EU Council Directive 93/98, Art. 1, p. 11.

The statute does produce uniformity with respect to copyrights in new, post-1977 works attributed to natural persons. Compare 17 U. S. C. § 302(a) with EU Council Directive 93/98, Art. 1(1), p. 11. But these works constitute only a subset (likely a minority) of works that retain commercial value after 75 years. See Appendix, Part B, *infra*. And the fact that uniformity comes so late, if at all, means that bringing American law into conformity with this particular aspect of European law will neither encourage creation nor benefit the long-dead author in any other important way.

What benefit, then, might this partial future uniformity achieve? The majority refers to "greater incentive for American and other authors to create and disseminate their work in the United States," and cites a law review article suggesting a need to " 'avoid competitive disadvantages.' " *Ante*, at 206. The Solicitor General elaborates on this theme, postulating that because uncorrected disuniformity would permit Europe, not the United States, to hold out the prospect of protection lasting for "life plus 70 years" (instead of "life plus 50 years"), a potential author might decide to publish initially in Europe, delaying American publication. Brief for Respondent 38. And the statute, by creating a uniformly longer term, corrects for the disincentive that this disuniformity might otherwise produce.

That disincentive, however, could not possibly bring about serious harm of the sort that the Court, the Solicitor Gen-

eral, or the law review author fears. For one thing, it is unclear just who will be hurt and how, should American publication come second—for the Berne Convention still offers full protection as long as a second publication is delayed by 30 days. See Berne Conv. Arts. 3(4), 5(4). For another, few, if any, potential authors would turn a "where to publish" decision upon this particular difference in the length of the copyright term. As we have seen, the present commercial value of any such difference amounts at most to comparative pennies. See *supra,* at 254–256. And a commercial decision that turned upon such a difference would have had to have rested previously upon a knife edge so fine as to be invisible. A rational legislature could not give major weight to an invisible, likely nonexistent incentive-related effect.

But if there is no incentive-related benefit, what is the benefit of the future uniformity that the statute only partially achieves? Unlike the Copyright Act of 1976, this statute does not constitute part of an American effort to conform to an important international treaty like the Berne Convention. See H. R. Rep. No. 94–1476, pp. 135–136 (1976) (The 1976 Act's life-plus-50 term was "required for adherence to the Berne Convention"); S. Rep. No. 94–473, p. 118 (1975) (same). Nor does European acceptance of the longer term seem to reflect more than special European institutional considerations, *i. e.,* the needs of, and the international politics surrounding, the development of the European Union. House Hearings 230 (statement of the Register of Copyrights); *id.,* at 396–398 (statement of J. Reichman). European and American copyright law have long coexisted despite important differences, including Europe's traditional respect for authors' "moral rights" and the absence in Europe of constitutional restraints that restrict copyrights to "limited Times." See, *e. g.,* Kwall, Copyright and the Moral Right: Is an American Marriage Possible? 38 Vand. L. Rev. 1–3 (1985) (moral rights); House Hearings 187 (testimony of the Register of Copyrights) ("limited [T]imes").

In sum, the partial, future uniformity that the 1998 Act promises cannot reasonably be said to justify extension of the copyright term for new works. And concerns with uniformity cannot possibly justify the extension of the new term to older works, for the statute there creates no uniformity at all.

Third, several publishers and filmmakers argue that the statute provides incentives to *those who act as publishers* to republish and to redistribute older copyrighted works. This claim cannot justify this statute, however, because the rationale is inconsistent with the basic purpose of the Copyright Clause—as understood by the Framers and by this Court. The Clause assumes an initial grant of monopoly, designed primarily to encourage creation, followed by termination of the monopoly grant in order to promote dissemination of already-created works. It assumes that it is the *disappearance* of the monopoly grant, not its *perpetuation*, that will, on balance, promote the dissemination of works already in existence. This view of the Clause does not deny the empirical possibility that grant of a copyright monopoly to the heirs or successors of a long-dead author could *on occasion* help publishers resurrect the work, say, of a long-lost Shakespeare. But it does deny Congress the Copyright Clause power to base its actions primarily upon that empirical possibility—lest copyright grants become perpetual, lest on balance they restrict dissemination, lest too often they seek to bestow benefits that are solely retroactive.

This view of the Clause finds strong support in the writings of Madison, in the antimonopoly environment in which the Framers wrote the Clause, and in the history of the Clause's English antecedent, the Statute of Anne—a statute which sought to break up a publishers' monopoly by offering, as an alternative, an author's monopoly of limited duration. See Patterson, Understanding the Copyright Clause, 47 J. Copyright Soc. 365, 379 (2000) (Statute of Anne); L. Patterson, Copyright in Historical Perspective 144–147 (1968)

(same); Madison on Monopolies 756–757; Papers of Thomas Jefferson 442–443; The Constitutional Convention and the Formation of the Union 334, 338 (W. Solberg 2d ed. 1990); see also *supra*, at 246–247.

This view finds virtually conclusive support in the Court's own precedents. See *Sony*, 464 U. S., at 429 (The Copyright Clause is "intended . . . to allow the public access . . . after the limited period of exclusive control"); *Stewart*, 495 U. S., at 228 (The copyright term is limited to avoid "permanently depriv[ing]" the public of "the fruits of an artist's labors"); see also *supra*, at 245–246.

This view also finds textual support in the Copyright Clause's word "limited." Cf. J. Story, Commentaries on the Constitution § 558, p. 402 (R. Rotunda & J. Nowak eds. 1987) (The Copyright Clause benefits the public in part because it "admit[s] the people at large, after a *short* interval, to the full possession and enjoyment of all writings . . . without restraint" (emphasis added)). It finds added textual support in the word "Authors," which is difficult to reconcile with a rationale that rests entirely upon incentives given to publishers perhaps long after the death of the work's creator. Cf. *Feist Publications, Inc.* v. *Rural Telephone Service Co.*, 499 U. S. 340, 346–347 (1991).

It finds empirical support in sources that underscore the wisdom of the Framers' judgment. See CRS Report 3 ("[N]ew, cheaper editions can be expected when works come out of copyright"); see also Part II–B, *supra*. And it draws logical support from the endlessly self-perpetuating nature of the publishers' claim and the difficulty of finding any kind of logical stopping place were this Court to accept such a uniquely publisher-related rationale. (Would it justify continuing to extend copyrights indefinitely, say, for those granted to F. Scott Fitzgerald or his lesser known contemporaries? Would it not, in principle, justify continued protection of the works of Shakespeare, Melville, Mozart, or perhaps Salieri, Mozart's currently less popular contemporary?

Could it justify yet further extension of the copyright on the song Happy Birthday to You (melody first published in 1893, song copyrighted after litigation in 1935), *still in effect* and currently owned by a subsidiary of AOL Time Warner? See Profitable "Happy Birthday," Times of London, Aug. 5, 2000, p. 6.)

Given this support, it is difficult to accept the conflicting rationale that the publishers advance, namely, that extension, rather than limitation, of the grant will, by rewarding publishers with a form of monopoly, promote, rather than retard, the dissemination of works already in existence. Indeed, given these considerations, this rationale seems constitutionally perverse—unable, constitutionally speaking, to justify the blanket extension here at issue. Cf. *ante*, at 239–240 (STEVENS, J., dissenting).

Fourth, the statute's legislative history suggests another possible justification. That history refers frequently to the financial assistance the statute will bring the entertainment industry, particularly through the promotion of exports. See, *e. g.*, S. Rep. No. 104–315, p. 3 (1996) ("The purpose of the bill is to ensure adequate copyright protection for American works in foreign nations and the continued economic benefits of a healthy surplus balance of trade"); 144 Cong. Rec., at H9951 (statement of Rep. Foley) (noting "the importance of this issue to America's creative community," "[w]hether it is Sony, BMI, Disney," or other companies). I recognize that Congress has sometimes found that suppression of competition will help Americans sell abroad—though it has simultaneously taken care to protect American buyers from higher domestic prices. See, *e. g.*, Webb-Pomerene Act (Export Trade), 40 Stat. 516, as amended, 15 U. S. C. §§ 61–65; see also IA P. Areeda & H. Hovenkamp, Antitrust Law ¶ 251a, pp. 134–137 (2d ed. 2000) (criticizing export cartels). In doing so, however, Congress has exercised its commerce, not its copyright, power. I can find nothing in the Copyright Clause that would authorize Congress to enhance the

copyright grant's monopoly power, likely leading to higher prices both at home and abroad, *solely* in order to produce higher foreign earnings. That objective is not a *copyright* objective. Nor, standing alone, is it related to any other objective more closely tied to the Clause itself. Neither can higher corporate profits alone justify the grant's enhancement. The Clause seeks public, not private, benefits.

Finally, the Court mentions as possible justifications "demographic, economic, and technological changes"—by which the Court apparently means the facts that today people communicate with the help of modern technology, live longer, and have children at a later age. *Ante,* at 206–207, and n. 14. The first fact seems to argue not for, but instead against, extension. See Part II–B, *supra.* The second fact seems already corrected for by the 1976 Act's life-plus-50 term, which automatically grows with lifespans. Cf. Department of Health and Human Services, Centers for Disease Control and Prevention, Deaths: Final Data for 2000 (2002) (Table 8) (reporting a 4-year increase in expected lifespan between 1976 and 1998). And the third fact—that adults are having children later in life—is a makeweight at best, providing no explanation of why the 1976 Act's term of 50 years after an author's death—a longer term than was available to authors themselves for most of our Nation's history—is an insufficient potential bequest. The weakness of these final rationales simply underscores the conclusion that emerges from consideration of earlier attempts at justification: There is no legitimate, serious copyright-related justification for this statute.

### III

The Court is concerned that our holding in this case not inhibit the broad decisionmaking leeway that the Copyright Clause grants Congress. *Ante,* at 204–205, 208, 222. It is concerned about the implications of today's decision for the Copyright Act of 1976—an Act that changed copyright's basic term from 56 years (assuming renewal) to life of the

author plus 50 years, *ante,* at 194–195. *Ante,* at 222. It is concerned about having to determine just how many years of copyright is too many—a determination that it fears would require it to find the "right" constitutional number, a task for which the Court is not well suited. See *ibid.;* but cf. *ante,* at 210, n. 17.

I share the Court's initial concern, about intrusion upon the decisionmaking authority of Congress. See *ante,* at 205, n. 10. But I do not believe it intrudes upon that authority to find the statute unconstitutional on the basis of (1) a legal analysis of the Copyright Clause's objectives, see *supra,* at 245–248, 260–263; (2) the total implausibility of any incentive effect, see *supra,* at 254–257; and (3) the statute's apparent failure to provide significant international uniformity, see *supra,* at 257–260. Nor does it intrude upon congressional authority to consider rationality in light of the expressive values underlying the Copyright Clause, related as it is to the First Amendment, and given the constitutional importance of correctly drawing the relevant Clause/Amendment boundary. *Supra,* at 243–245. We cannot avoid the need to examine the statute carefully by saying that "Congress has not altered the traditional contours of copyright protection," *ante,* at 221, for the sentence points to the question, rather than the answer. Nor should we avoid that examination here. That degree of judicial vigilance—at the far outer boundaries of the Clause—is warranted if we are to avoid the monopolies and consequent restrictions of expression that the Clause, read consistently with the First Amendment, seeks to preclude. And that vigilance is all the more necessary in a new century that will see intellectual property rights and the forms of expression that underlie them play an ever more important role in the Nation's economy and the lives of its citizens.

I do not share the Court's concern that my view of the 1998 Act could automatically doom the 1976 Act. Unlike the present statute, the 1976 Act thoroughly revised copyright law and enabled the United States to join the Berne Conven-

tion—an international treaty that requires the 1976 Act's basic life-plus-50 term as a condition for substantive protections from a copyright's very inception, Berne Conv. Art. 7(1). Consequently, the balance of copyright-related harms and benefits there is far less one sided. The same is true of the 1909 and 1831 Acts, which, in any event, provided for maximum terms of 56 years or 42 years while requiring renewal after 28 years, with most copyrighted works falling into the public domain after that 28-year period, well before the putative maximum terms had elapsed. See *ante*, at 194; Statistical History 956–957. Regardless, the law provides means to protect those who have reasonably relied upon prior copyright statutes. See *Heckler* v. *Mathews*, 465 U. S. 728, 746 (1984). And, in any event, we are not here considering, and we need not consider, the constitutionality of other copyright statutes.

Neither do I share the Court's aversion to line-drawing in this case. Even if it is difficult to draw a single clear bright line, the Court could easily decide (as I would decide) that this particular statute simply goes too far. And such examples—of what goes too far—sometimes offer better constitutional guidance than more absolute-sounding rules. In any event, "this Court sits" in part to decide when a statute exceeds a constitutional boundary. See *Panhandle Oil*, 277 U. S., at 223 (Holmes, J., dissenting). In my view, "[t]ext, history, and precedent," *ante*, at 199, support both the need to draw lines in general and the need to draw the line here short of this statute. See *supra*, at 242–248, 260–263. But see *ante*, at 199, n. 4.

Finally, the Court complains that I have not "restrained" my argument or "train[ed] my] fire, as petitioners do, on Congress' choice to place existing and future copyrights in parity." *Ante*, at 193, n. 1, and 199, n. 4. The reason that I have not so limited my argument is my willingness to accept, for purposes of this opinion, the Court's understanding that, for reasons of "[j]ustice, policy, and equity"—as well as es-

tablished historical practice—it is not "categorically beyond Congress' authority" to "exten[d] the duration of existing copyrights" to achieve such parity. *Ante*, at 204 (internal quotation marks omitted). I have accepted this view, however, only for argument's sake—putting to the side, for the present, JUSTICE STEVENS' persuasive arguments to the contrary, *ante*, at 226–242 (dissenting opinion). And I make this assumption only to emphasize the lack of rational justification for the present statute. A desire for "parity" between *A* (old copyrights) and *B* (new copyrights) cannot justify extending *A* when there is no rational justification for extending *B*. At the very least (if I put aside my rationality characterization), to ask *B* to support *A* here is like asking Tom Thumb to support Paul Bunyan's ox. Where the case for extending new copyrights is itself so weak, what "justice," what "policy," what "equity" can warrant the tolls and barriers that extension of existing copyrights imposes?

## IV

This statute will cause serious expression-related harm. It will likely restrict traditional dissemination of copyrighted works. It will likely inhibit new forms of dissemination through the use of new technology. It threatens to interfere with efforts to preserve our Nation's historical and cultural heritage and efforts to use that heritage, say, to educate our Nation's children. It is easy to understand how the statute might benefit the private financial interests of corporations or heirs who own existing copyrights. But I cannot find any constitutionally legitimate, copyright-related way in which the statute will benefit the public. Indeed, in respect to existing works, the serious public harm and the virtually nonexistent public benefit could not be more clear.

I have set forth the analysis upon which I rest these judgments. This analysis leads inexorably to the conclusion that the statute cannot be understood rationally to advance a constitutionally legitimate interest. The statute falls outside

the scope of legislative power that the Copyright Clause, read in light of the First Amendment, grants to Congress. I would hold the statute unconstitutional.

I respectfully dissent.

## APPENDIX TO OPINION OF BREYER, J.

### A

The text's estimates of the economic value of 1998 Act copyrights relative to the economic value of a perpetual copyright, *supra*, at 255–256, as well as the incremental value of a 20-year extension of a 75-year term, *supra*, at 254–255, rest upon the conservative future value and discount rate assumptions set forth in the brief of economist *amici*. Brief for George A. Akerlof et al. as *Amici Curiae* 5–7. Under these assumptions, if an author expects to live 30 years after writing a book, the copyright extension (by increasing the copyright term from "life of the author plus 50 years" to "life of the author plus 70 years") increases the author's expected income from that book—*i. e.*, the economic incentive to write—by no more than about 0.33%. *Id.*, at 6.

The text assumes that the extension creates a term of 95 years (the term corresponding to works made for hire and for all existing pre-1978 copyrights). Under the economists' conservative assumptions, the value of a 95-year copyright is slightly more than 99.8% of the value of a perpetual copyright. See also Tr. of Oral Arg. 50 (Petitioners' statement of the 99.8% figure). If a "life plus 70" term applies, and if an author lives 78 years after creation of a work (as with Irving Berlin and Alexander's Ragtime Band), the same assumptions yield a figure of 99.996%.

The most unrealistically conservative aspect of these assumptions, *i. e.*, the aspect most unrealistically favorable to the majority, is the assumption of a constant future income stream. In fact, as noted in the text, *supra*, at 248, uncontested data indicate that no author could rationally expect

that a stream of copyright royalties will be constant forever. Indeed, only about 2% of copyrights can be expected to retain commercial value at the end of 55 to 75 years. *Ibid.* Thus, in the overwhelming majority of cases, the ultimate value of the extension to copyright holders will be zero, and the economic difference between the extended copyright and a perpetual copyright will be zero.

Nonetheless, there remains a small 2% or so chance that a given work will remain profitable. The CRS Report suggests a way to take account of both that likelihood and the related "decay" in a work's commercial viability: Find the annual decay rate that corresponds to the percentage of works that become commercially unavailable in any given year, and then discount the revenue for each successive year accordingly. See CRS Report 7. Following this approach, if one estimates, conservatively, that a full 2% of all works survives at the end of 75 years, the corresponding annual decay rate is about 5%. I instead (and again conservatively) use the 3.8% decay rate the CRS has applied in the case of books whose copyrights were renewed between 1950 and 1970. *Ibid.* Using this 3.8% decay rate and the economist *amici*'s proposed 7% discount rate, the value of a 95-year copyright is more realistically estimated not as 99.8%, but as 99.996% of the value of a perpetual copyright. The comparable "Irving Berlin" figure is 99.99999%. (With a 5% decay rate, the figures are 99.999% and 99.999998%, respectively.) Even these figures seem likely to be underestimates in the sense that they assume that, if a work is still commercially available, it earns as much as it did in a year shortly after its creation.

## B

Conclusions regarding the economic significance of "works made for hire" are judgmental because statistical information about the ratio of "for hire" works to all works is scarce. Cf. *Community for Creative Non-Violence* v. *Reid,* 490 U. S. 730, 737–738, n. 4 (1989). But we know that, as of 1955,

copyrights on "for hire" works accounted for 40% of newly registered copyrights. Varmer, Works Made for Hire and on Commission, Study No. 13, in Copyright Law Revision Studies Nos. 1–19, prepared for the Subcommittee on Patents, Trademarks, and Copyrights of the Senate Committee on the Judiciary, 86th Cong., 2d Sess., 139, n. 49 (Comm. Print 1960). We also know that copyrights on works typically made for hire—feature-length movies—were renewed, and since the 1930's apparently have remained commercially viable, at a higher than average rate. CRS Report 13–14. Further, we know that "harmonization" looks to benefit United States exports, see, e. g., H. R. Rep. No. 105–452, p. 4 (1998), and that films and sound recordings account for the dominant share of export revenues earned by new copyrighted works of potential lasting commercial value (i. e., works other than computer software), S. Siwek, Copyright Industries in the U. S. Economy: The 2002 Report 17. It also appears generally accepted that, in these categories, "for hire" works predominate. E. g., House Hearings 176 (testimony of the Register of Copyrights) ("[A]udiovisual works are generally works made for hire"). Taken together, these circumstances support the conclusion in the text that the extension fails to create uniformity where it would appear to be most important—pre-1978 copyrighted works nearing the end of their pre-extension terms, and works made for hire.